CARGILL, INCORPORATED, Plaintiff-
Appellee,

v.

COMMODITY CREDIT CORPORATION,
Defendant-Appellant.

No. 61, Docket 25523.

United States Court of Appeals
Second Circuit.

Argued Dec. 8, 1959.

Decided Feb. 23, 1960.

Leonard Garment, New York City (Paul R. Shanahan, of R. J. & P. R. Shanahan, Syracuse, N. Y., Weston B. Grimes of Carey & Grimes, Washington, D. C., and Milton Black of Mudge, Stern, Baldwin & Todd, New York City, on the brief), for plaintiff-appellee.

Lionel Kestenbaum, Atty., Dept. of Justice, Washington, D. C. (George Cochran Doub, Asst. Atty. Gen., and Theodore F. Bowes, U. S. Atty., Syracuse, N. Y., and Morton Hollander, Washington, D. C., on the brief), for defendant-appellant.

Before LUMBARD, Chief Judge, and HAND and FRIENDLY, Circuit Judges.

FRIENDLY, Circuit Judge.

Commodity Credit Corporation, "an agency and instrumentality of the United States, within the Department of Agriculture" created by the Act of June 29, 1948, ch. 704, 62 Stat. 1070, 15 U.S. C.A. § 714, appeals from a judgment of the District Court for the Northern District of New York in an action brought against Commodity by Cargill, Inc., a warehouseman. The judgment upheld Cargill's claim for charges totalling $552,188.33 for storing Commodity's grain, and dismissed Commodity's counterclaim for $1,203,581.70 for damages to certain of the grain.[1] The judgment dismissing the counterclaim was entered pursuant to the verdict of a jury to which the District Judge had submitted it over Commodity's objection that § 4(c) of Commodity's Charter Act, 15 U.S. C.A. § 714b(c), required that the entire cause be tried by the judge alone. After the verdict against Commodity on its counterclaim for damages, Judge Brennan tried Cargill's claim for the storage charges and rendered judgment for the plaintiff. This totaled $739,142.65, including interest to September 15, 1958, plus costs.

The view which we take makes it unnecessary to deal with many of the issues argued before us. We hold that it was error for the District Judge to have ordered a jury trial on Commodity's counterclaim, that the error cannot be disregarded as harmless, and that the cause must therefore be remanded for findings and conclusions by the District Judge, independent of the jury's verdict, on the counterclaim as well as on the claim, pursuant to Fed.R.Civ.Proc. 52 (a), 28 U.S.C. Since the District Judge may have to consider the burden of proof and will have to determine the sufficiency of a notice by Cargill described below, we shall state our views on those issues.

The case arises from Cargill's storage, at Norris City, Illinois, and Albany, New York, of large amounts of corn for Commodity in implementation of the government's price support program. Cargill sued to collect charges with respect to this storage as well as for the storage

---

1. Another counterclaim, for $7,307.50, which was allowed, does not figure on this appeal.

of wheat and barley at Buffalo. Commodity counterclaimed for damages to the corn at Norris City and Albany. It denied liability for the charges at these two locations because of the negligent storage alleged in its counterclaim; it did not dispute liability for the charges at Buffalo except as recovery on the counterclaim might be set off against these. The grain was stored under a standard form known as the Uniform Grain Storage Agreement; this was negotiated periodically between Commodity and warehousemen whose facilities it used in its storage program.

Cargill's facility at Norris City was not a conventional grain elevator but consisted of 15 steel tanks formerly used for oil and gasoline. In the summer of 1949 Cargill agreed that it would adapt these tanks for the storage of 5,000,000 bushels of corn. The contract was the 1946 form of the Uniform Grain Storage Agreement. A further agreement was later executed in the 1950 form, but so far as Norris City is concerned, the differences between the forms are not material, since the Norris City grain was at all times stored "identity preserved," and Cargill's obligation admittedly did not go beyond that of due care. The delivery of the corn began September 29, 1949 and continued to June 28, 1950. As early as June 9, 1950, it was found that some of the corn had deteriorated; loading out began on that date and continued during the next two years. Commodity asserted that Cargill failed to supply adequate equipment and personnel, failed to correct or avoid machinery breakdowns, bad roads and leaky roofs, and gave tardy notices of spoilage. Damages were alleged to approximate $800,000.

Cargill's Albany facility was a large conventional grain elevator having a capacity of 13,000,000 bushels. All of Commodity's corn at Albany was stored under the 1950 Uniform Grain Storage Agreement. This contained provisions for the commingling of Commodity's corn with other corn being stored there. Cargill does not dispute that Cargill's liability for the condition of Commodity's corn at Albany, which was stored commingled, was initially that of an insurer; as Cargill's counsel stated at the trial, "under commingled storage the warehouseman must deliver out the grade that was received in." However, the Agreement contained a provision, as to which more must be said hereafter, whereby, on giving notice after inspection, the warehouseman reduces his responsibility from that time forward to one of due care. Some 3,000,000 bushels of Commodity's corn were stored in Albany, beginning in May, 1950. By the summer of 1951 signs of deterioration appeared; Cargill claims it gave the critical notice on August 17. When Commodity loaded out the corn in November, some of it had greatly deteriorated. Commodity denied that Cargill's notice complied with the Agreement and claimed that even if it did, the corn had already deteriorated and that Cargill did not exercise due care after the notice. Damages were claimed to be some $400,-000.

Section 4(c) of the Commodity Credit Corporation Charter Act, 15 U.S.C.A. § 714b(c), provides that "All suits against the Corporation shall be tried by the court without a jury." Nevertheless, Cargill demanded and the District Judge, over Commodity's objection, granted a jury trial on Commodity's counterclaim. He directed also that the counterclaim be first tried and that the evidence taken upon the jury trial of the counterclaim be considered upon the subsequent trial of Cargill's claim by the judge.

Judge Brennan submitted to the jury two questions as to Norris City and four as to Albany. The first question as to Norris City was whether Commodity had "established that the shrinkage in quantity or the deficiency in quality of Commodity Credit Corp. corn stored at Norris City resulted from the failure of Cargill to exercise due care in connection with the storage thereof?" The jury answered this in the negative; accordingly it did not answer the second question relating to damages. With re-

spect to Albany the jury answered in the affirmative a question whether Cargill gave "notice to Commodity Credit Corp. according to the terms of the Uniform Grain Storage Agreement that the corn stored for the account of Commodity Credit Corp. at Albany was in danger of going out of condition," and in the negative a question whether Commodity had "established that the shrinkage in quantity or the deficiency in quality of Commodity Credit Corp. corn stored at Albany resulted from the failure of Cargill to exercise due care in connection with the storage thereof"; the jury found it unnecessary to answer the other questions, namely, as to waiver of any deficiency in the notice and as to the amount of damages. After the jury's verdict Judge Brennan proceeded to try Cargill's claim for storage charges; this, of course, involved broadly the same issues as Commodity's counterclaim. In a Memorandum-Decision the judge found "that the evidence showed the performance of the contract by Cargill as to the unpaid storage charges at Norris City." As to Albany he stated that "The jury found in the trial of the counter-claim that such a notice was given by Cargill as to the Albany corn" and "The court would agree and makes a similar finding." He noted that Cargill had "offered evidence that at the time of the notice, it had the ability to load out the required grade and quality called for by the storage documents" and said "This evidence is not disputed except by inference." As to the post-notice period he said that "No specific evidence of negligence in the performance or non-performance of the warehousing services was offered," and that "the finding that Cargill has established its cause of action for the Albany storage charges is justified if not required by the evidence." He directed the entry of judgment granting Cargill's claim against Commodity for the storage charges, with interest at the respective legal rates of Illinois and New York, and dismissing Commodity's counterclaim. From that judgment Commodity has appealed.

 (1) *It was error to grant a jury trial on Commodity's counterclaim.* There was no dispute that § 4(c) of the Charter Act ruled out a jury trial on Cargill's claim against Commodity for storage charges. We hold it also ruled out a jury trial on Commodity's counterclaim. The question is solely one of statutory interpretation, not of constitutionality. McElrath v. United States, 1880, 102 U.S. 426, 440, 26 L.Ed. 189, established that suits against the government, "whether reference be had to the claimant's demand or to the defense, or to any set-off, or counterclaim which the government may assert, are not controlled by the Seventh Amendment"; and we do not understand appellee to claim there is any constitutional barrier to Congress' conditioning its waiver of immunity as to Commodity, "an agency or instrumentality of the United States," on requiring both claim and counterclaim to be tried to a judge. In any event we find there is none. See Maricopa County, Arizona v. Valley National Bank, 1943, 318 U.S. 357, 362, 63 S.Ct. 587, 87 L.Ed. 834; Rainwater v. United States, 1958, 356 U.S. 590, 78 S.Ct. 946, 2 L.Ed.2d 996.

We find no support in the language of the Charter Act for the view, urged by Cargill and upheld by the District Court, that, in a suit against Commodity, although the claim must be tried to the judge, a counterclaim may be tried to a jury. The statute speaks in terms of "suits," not of claims. Commodity's counterclaim was part of the "suit"— indeed Fed.R.Civ.Proc. 13(a) required that it be asserted therein. That Cargill would have been entitled to a jury trial if Commodity had sued it affords no basis for contrary inference; for Congress lacked constitutional power to provide otherwise. And when we look to the reason of the statute, the conclusion is the same. For Congress could well have foreseen that often claim and counterclaim would present the same issues, as was the case here, and that a jury verdict on the counterclaim, if that were first tried, would impair the judge's

ability to act independently on the claim as Congress intended him to do.

If language and reason left any basis for doubt, history would remove it. The Committee reports on the Charter Act of 1948 state that "the provision requiring all suits against the Corporation to be tried by the Court without a jury is similar to the procedure followed in the Court of Claims and in the Federal District Courts in claims against the United States authorized by the Tucker Act and the Federal Tort Claims Act which are the statutes giving general jurisdiction to the Federal courts in claims against the United States." 80th Cong., 2d Sess., S.Rep. No. 1022, p. 11, H.R.Rep. No. 1790, p. 10. The Act of March 3, 1863, ch. 92, § 3, 12 Stat. 765, 28 U.S.C. § 2508, provided that the Court of Claims "in addition to the jurisdiction now conferred by law, shall also have jurisdiction of all set-offs, counterclaims, claims for damages, whether liquidated or unliquidated, or other demands whatsoever, on the part of the Government against any person making any claim against the Government in said court; and upon the trial of any such cause it shall hear and determine such claim or demand both for and against the Government and claimant." In 1880, as we have seen, McElrath settled that this denial of jury trial on counterclaims as well as claims did not offend the Seventh Amendment. Section 1 of the Tucker Act of 1887, ch. 359, 24 Stat. 505, continued the jurisdiction of the Court of Claims provided in the 1863 Act, although omitting the clause after the semi-colon; Section 2 gave the District Courts concurrent jurisdiction "as to all matters named in the preceding section" up to specified amounts, and provided: "All causes brought and tried under the provisions of this act shall be tried by the court without a jury." 28 U.S.C. §§ 1346, 2401, 2402. In the light of this language and the Supreme Court's teaching that "The substantial rights of claimants are to be governed alike whether suit is brought in the Court of Claims or the District Court," Bates Manufacturing Co. v.

United States, 1938, 303 U.S. 567, 570, 58 S.Ct. 694, 695, 82 L.Ed. 1020, see United States v. Sherwood, 1941, 312 U.S. 584, 591, 61 S.Ct. 767, 85 L.Ed. 1058, we think that when the Charter Act was passed in 1948, it was plain that a counterclaim in a suit in the District Court under the Tucker Act must be tried to the judge, as was later held in Terminal Warehouse of New Jersey v. United States, D.C.D.N.J.1950, 91 F. Supp. 327; and the reports show that Congress must have intended this also in suits against Commodity.

We see no force in Cargill's attempt to minimize this history on the ground that the Committee reports antedated by a few months the recodification of the provisions against jury trial of the Tucker Act and the Federal Tort Claims Act, 60 Stat. 843, into 28 U.S.C. § 2402 by the Act of June 25, 1948, ch. 646, 62 Stat. 869, 971. For, apart from Commodity's answer that "the Judicial Code did not spring full-blown in June, 1948," the inference as to Congressional purpose is the same whether the reference in the Committee reports was to the provisions on jury trial before or after the recodification. Neither does Cargill obtain the support that it seeks from the Committee references to the Federal Tort Claims Act. For neither of the cases cited by Cargill, United States v. Yellow Cab Co., 1951, 340 U.S. 543, 71 S.Ct. 399, 95 L.Ed. 523, and United States v. Rosati, D.C.D.N.J.1951, 97 F.Supp. 747, decided or even suggested that the Tort Claims Act permits jury trial of a counterclaim by the United States, and Professor Moore has written persuasively to the contrary, 5 Federal Practice ¶38.31(2), at 235–236.

The District Judge's conclusion that Cargill was entitled to a jury trial on Commodity's counterclaim was founded primarily on United States v. Pfitsch, 1921, 256 U.S. 547, 41 S.Ct. 569, 65 L. Ed. 1084. There the question was not, as here, whether a statute prohibiting a jury trial in a suit against the United States comprehended a counterclaim by the United States, but whether a plain-

tiff might have a jury trial against the United States under a section of a statute that was silent on the subject. The Court held he could because the section in question conferred jurisdiction on the District Court alone, whereas other sections conferred jurisdiction on the Court of Claims and concurrently on the District Court under the Tucker Act and the legislative history showed the distinction was deliberately made. United States v. Pfitsch being thus inapposite, we hold that it was error for the District Judge to permit a jury trial on Commodity's counterclaim.

(2) *The error was not harmless.* Cargill urges that even if the District Judge erred in granting a jury trial on Commodity's counterclaim, the error was not prejudicial. It claims the District Judge, in passing on Cargill's claims for the storage charges, made independent findings which are dispositive of the counterclaim, and urges that the jury verdict had no more effect than that of an advisory jury, Fed.R.Civ.Proc. 39(c), which the judge indicated he would impanel even if Cargill had no right to jury trial.[2] Commodity says the judge's findings did not represent his independent judgment. It points to their conclusory nature, to his references to agreement with the jury, and especially to his oral statement, on the trial of Cargill's claim, that the jury's finding "that there is not sufficient proof that they [Cargill] failed to perform their contract" presented the trier of the facts with "a rather unusual situation" and that "it would be a rather curious decision to have this controversy rest that there is no evidence of breach of contract and yet there is no evidence of performance." It urges also that even if the findings of the District Judge were independent, which it denies, they were not sufficiently detailed to meet the requirements of Fed.R.Civ. Proc. 52(a). To this Cargill responds

with Hurwitz v. Hurwitz, 78 U.S.App. D.C. 66, 136 F.2d 796, 799, 148 A.L.R. 226. Hurwitz had been tried to a jury over appellant's objection that the claim arose in equity and that he was thus entitled to findings by the judge. The Court of Appeals declined to reverse, holding that findings are not "a jurisdictional requirement of appeal which this court may not waive," that "in cases where the record is so clear that the court does not need the aid of findings it may waive such a defect on the ground that the error is not substantial in the particular case," and that the Court of Appeals would do that since the judge's charge to the jury adequately disclosed the issues of fact and upon a review of the evidence the Court would reach the same result.

We do not think it would be appropriate for us to follow that course. The privilege of a suitor in equity to trial by the court, itself largely an accident of history—see Plucknett, A Concise History of the Common Law, pp. 675–80 (5th ed. 1956)—while deserving appropriate protection, is scarcely of the same standing as the right of the government, founded on a command of Congress, to the independent and detailed findings of a judge. Moreover, even if we were persuaded that Judge Brennan's findings here were independent, the case is not one, like Hurwitz, where "the court [of Appeals] does not need the aid of findings" more detailed than can be extracted from the Memorandum-Decision. The trial had consumed almost a month, with a transcript of 2650 pages and numerous exhibits. Yet, as to Norris City, the memorandum tells us nothing on the issue of due care save that evidence was offered "as to the day-to-day care exercised by Cargill in the attempted maintenance of the corn stored in the tanks" and that the judge found this sufficient. With respect to Albany, on

2. Honeycutt v. United States, D.C.W.D.La. 1956, 19 F.R.D. 229, held an advisory jury was not permissible in a suit under the Federal Tort Claims Act, refusing to follow the statement in Schetter v. Housing Authority of Erie, D.C.W.D.Pa.1955,

132 F.Supp. 149, 154. Professor Moore's view accords with Schetter, 5 Federal Practice ¶39.10, at 722, fn. 8. We are not required to decide whether Judge Brennan could have impaneled an advisory jury here and do not do so.

the vital issue of the sufficiency of the notice, the judge, after referring to the answer given by the jury on the trial of the counterclaim, said that he "would agree and makes a similar finding"; if the only question were the conformity of the language of the notice to the contract, this would suffice but, as will appear below, there was also a question what inspection had in fact been made and we cannot be certain the judge made any finding on this. On the issue of the condition of the corn on August 17, Commodity relied on a bin chart of August 18 which it claimed to show that serious deterioration had already occurred; Cargill countered with testimony that the bin chart was not representative. Discussion of this evidence occupies over 4 pages of Commodity's brief, 8 pages of Cargill's and 3 of Commodity's reply brief, but all we have from the judge is that Cargill offered evidence of its ability to load out the required grade and quality of corn and that "This evidence is not disputed except by inference,"—a statement which does not accord with our reading of the record. With respect to the period after August 17, Commodity's principal claim of lack of due care by Cargill related to the alleged mixing of 77,000 bushels of corn of lower grade which, Commodity contended, were more likely to deteriorate and might have accelerated the deterioration of the rest. Argument on this issue, which involves numerous calculations and analyses made by the witnesses, occupies 5 pages of Commodity's brief, 6 of Cargill's and 4 of Commodity's reply brief; yet the District Judge says only that "no specific evidence of negligence in the performance or nonperformance of the warehousing services was offered."

Judge Brennan would surely not have contented himself with these limited remarks save for the jury's having passed on the same evidence in disposing of Commodity's counterclaim. Recourse to that is no longer permissible in view of our holding that it was error to submit the counterclaim to the jury and, even

if the jury's verdict could be regarded as advisory, as to which see footnote 2, the case is no better since "the review on appeal is from the Court's judgment as though no jury had been present." Major v. Phillips-Jones Corp., 2 Cir., 1951, 192 F.2d 186, 189, certiorari denied, 1952, 343 U.S. 927, 72 S.Ct. 760, 96 L.Ed. 1338; American Lumbermen's Mutual Casualty Co. v. Timms and Howard, 2 Cir., 1939, 108 F.2d 497, 500. It is useful to recall Judge Frank's statements in United States v. Forness, 2 Cir., 1942, 125 F.2d 928, 942, as to "the grave importance of fact-finding" and the role of detailed findings in "evoking care on the part of the trial judge in ascertaining the facts" as well as in aiding appellate courts and separating the findings of facts, by which we are bound unless "clearly erroneous," and the application of law to those facts. In this case we must enforce not only Fed.R.Civ. Proc. 52(a), but also a statute adopted by Congress decreeing trial by judge in the light of that Rule. It would not be consistent with either for us to attempt to perform the duty of fact-finding in place of the trial judge. Accordingly we return the record to him to execute that task.

(3) *Commodity has the burden of proving that deterioration of the corn was caused by Cargill's failure to follow the required standard of care.* While our disposition of the previous issues eliminates the questions raised as to the judge's charge on burden of proof, the judge may himself be concerned with that question.

■ Commodity says that its claim against Cargill for deterioration of the corn presents a question of Federal law, that we should find this in the Uniform Warehouse Receipts Act, and that the Act imposes the burden of proof upon the bailee. We think the premise that Commodity's rights and duties "are governed by federal rather than local law" and that Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, is thus inapplicable, to be sufficiently supported by Clearfield Trust Co. v.

United States, 1943, 318 U.S. 363, 366, 63 S.Ct. 573, 87 L.Ed. 838 and the cases that have followed it; for on this point we see no tenable distinction between the United States and a corporation stated by its founding act to be "an agency and instrumentality of the United States, within the Department of Agriculture." See D'Oench, Duhme & Co. v. Federal Deposit Insurance Corp., 1942, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956.

One "source of reference for fashioning federal rules applicable to these federal questions," 318 U.S. 367, 63 S.Ct. 575, is that used in Clearfield, namely, the decisions of federal courts. We held in Alpine Forwarding Co. v. Pennsylvania R. Co., 2 Cir., 1932, 60 F.2d 734, 736, certiorari denied 1932, 287 U.S. 647, 53 S.Ct. 93, 77 L.Ed. 559, that although "The bailor, upon proving the bailment and injury, is entitled to the benefit of a presumption of fault which the bailee must meet," this is "a mere rule for the conduct of the trial" and the ultimate burden of persuasion rested on the bailor, see Cummings v. Pennsylvania R. Co., C.C.1930, 45 F.2d 152. This has been recognized to be "undoubtedly the great weight of decisional law." Denning Warehouse Co. v. Widener, 10 Cir., 1949, 172 F.2d 910, 912, 13 A.L.R.2d 669. The Supreme Court cited Alpine with approval in Commercial Molasses Corp. v. New York Tank Barge Corp., 1941, 314 U.S. 104, 110–111, 62 S.Ct. 156, 160, 86 L.Ed. 89, where Chief Justice Stone said that, in the case of a bailee who has not assumed a common carrier's obligation, "the burden of proving the breach of duty or obligation rests upon him who must assert it as the ground of the recovery which he seeks" although the law lays on the bailee "the duty to come forward with the information available to him." Alliance Assurance Co. v. United States, 2 Cir., 1958, 252 F.2d 529, 535, relied on by

Commodity, is not to the contrary, since we assimilated the government's position as bailee in that case to that of a common carrier.

Commodity says that in our quest for "federal law" we should look rather to the Uniform Warehouse Receipts Act, which has been widely adopted, citing New York, New Haven & Hartford R. Co. v. R. F. C., 2 Cir., 1950, 180 F.2d 241, 244 where we so employed the Uniform Negotiable Instruments Law. The provision of the Uniform Warehouse Receipts Act claimed to be pertinent is the clause in § 8 that "In case the warehouseman refuses or fails to deliver the goods in compliance with a demand by the holder or depositor so accompanied, the burden shall be upon the warehouseman to establish the existence of a lawful excuse for such refusal." However, it is by no means clear that this applies when the warehouseman has delivered the goods in a damaged condition. And there is further doubt whether, even in cases where § 8 clearly does apply, it imposes on the warehouseman the ultimate burden of proof or merely the burden of coming forward with evidence of due care. Although Denning Warehouse Co. v. Widener, supra, is persuasive that a change in the common law rule as to nondelivery was intended, the states are sharply divided in their interpretation, 13 A.L.R.2d 681.[3] The Uniform Warehouse Receipts Act would thus not seem to be a fruitful source for finding "federal law" to govern the issue here presented.

The Supreme Court stated in Clearfield Trust Co. v. United States, supra, 318 U.S. at page 367, 63 S.Ct. at page 575, that "In our choice of the applicable federal rule we have occasionally selected state law," citing Royal Indemnity Co. v. United States, 1941, 313 U.S. 289, 297, 61 S.Ct. 995, 85 L.Ed. 1361. Here

---

3. The confusion seems to go back to the Commissioners' Note to § 8. This says, "The burden imposed on the warehouseman in the last paragraph agrees with existing law," citing Burnell v. New York Central R. Co., 1871, 45 N.Y. 184. But

"existing law" imposed only a burden of going forward on a bailee who was not a common carrier, and, in Claflin v. Meyer, 1878, 75 N.Y. 260, 262, Judge Hand explained Burnell as doing only this.

the relevant state laws would be those of New York and Illinois.

The law of New York plainly imposes the burden on the bailor in a case such as this. In Claflin v. Meyer, supra, 75 N.Y. at page 264, the Court of Appeals said that a plaintiff suing a warehouseman, in that instance for a loss by theft, must in all cases "allege negligence and prove negligence. This burden is never shifted from him." Castorina v. Rosen, 1943, 290 N.Y. 445, 447, 49 N.E.2d 521, 522, a case of damage, quoted this with approval as settling the law of New York. save only for "cases involving common carriers, and cases where there is an entirely unexplained failure to return the bailed goods," and referred to the Uniform Warehouse Receipts Act incorporated in Article 9 of the General Business Law as indicating that the Legislature "has shown no inclination to change the traditional rules as to warehousemen's liabilities. (See §§ 95, 107)." [4] The Illinois law is less clear. There is language in Cumins v. Wood, 1867, 44 Ill. 416, that might seem to place the burden of showing due care on the bailee in all cases, but Miles v. International Hotel Co., 1919, 289 Ill. 320, 124 N.E. 599, 602, characterized the rule of that case as being "not to shift the burden of proof from plaintiff to the defendant, but simply the burden of proceeding." Commodity contends that Brenton v. Sloan's United Storage & Van Co., 1942, 315 Ill.App. 278, 282–284, 42 N.E.2d 945, 947, shows that under the

Uniform Act Illinois imposes the ultimate burden on the bailee when the goods are destroyed; on the other hand, Scottville Apple Products Co. v. Rafelson Co., 1954, 2 Ill.App.2d 52, 118 N.E.2d 59, indicates a less stringent rule for spoilage of perishable commodities. We would not feel justified in relying on indications from an intermediate court decision such as Brenton against the statement of the Illinois Supreme Court in Miles.

■ We conclude therefore that "federal law" to govern this case cannot feasibly be found in the Uniform Warehouse Receipts Act and that, whether we take federal decisions or the law of New York and Illinois as the "source of reference," the ultimate burden rests on Commodity.

(4) *Cargill's notice was sufficient if in fact there was an inspection sufficient to determine that deterioration could not be prevented by conditioning.* As stated above, the parties agree that under the commingled-storage contract Cargill was initially liable for deterioration regardless of fault. They agree also that Cargill could transform its liability into one for due care by compliance with the provisions of paragraph 10 of the Uniform Grain Storage Agreement which we quote in the margin.[5] There is sharp dispute whether Cargill did so comply.

During July, 1951, Cargill found heating areas in the corn and requested Commodity to begin moving it out. Cargill

---

**4.** These sections correspond to §§ 8 and 21 of the Uniform Act.

**5.** "If after the exercise of such care in receiving, storing, and conditioning of such grain as a reasonably prudent owner thereof would exercise, deterioration cannot be prevented by conditioning as determined by an inspection at the expense of the warehouseman (such inspection to be performed by an inspector licensed under the United States Grain Standards Act [7 U.S.C.A. § 71 et seq.] or by an inspector agreed upon promptly by the warehouseman and Commodity) the warehouseman shall immediately notify Commodity of such fact, if the warehouse receipts held by Commodity are the oldest outstanding receipts representing the commingled grain which is out of condition, or in danger of becoming so, or if such grain is stored identity preserved under this agreement, and shall dispose of, or care for, such grain at the expense of and in accordance with the directions of Commodity. Unless the warehouseman fails to exercise due care or fails to comply with the directions of Commodity, he shall be liable for deterioration in the quality of such grain which is determined to be out of condition or in danger of becoming so only until the date he notifies Commodity or the date such inspection is performed, whichever is later."

continued to press for this, but with no effect. On August 9, Cargill wrote Commodity that it had learned that one of the large bins showed "signs of going out of condition," that if this corn were moved out immediately it was quite possible that Cargill could "maintain a grade of '#2' Yellow," but "we are now going on record that we will not be responsible for the out-grade in this bin." On August 14, Commodity replied that "while we will do everything possible to move this corn as soon as practical, we nevertheless must decline your denial of responsibility * * *" This produced interoffice correspondence among Cargill officials culminating in an instruction from the head office to the Superintendent at Albany "to have a licensed grain inspector examine all corn stocks and write CCC attention Valentine at New York his opinion of condition." An examination of the corn was made on August 17 by Curran, an inspector licensed under the United States Grain Standards Act; he then wrote Commodity the letter set forth in the margin.[6] On September 26 Curran wrote that, since his letter of August 17, damage had progressed and that in his opinion if the corn "is not shipped in the near future, the balance of your corn stock will very likely go the same way." Neither of these was acknowledged. A Commodity official testified there was no way in which Commodity could have moved the corn out of Albany consistently with the government's program at that time. In November, 1951, the Department of Agriculture permitted sales and Commodity began to load out the corn.

Under section 2 of the United States Grain Standards Act, 7 U.S.C.A. § 74, the Secretary of Agriculture has established official grades for corn and persons are licensed "to inspect and grade grain and to certificate the grade thereof for shipment or delivery for shipment in interstate or foreign commerce," 7 U.S.C.A. § 79. Commodity contends the inspection referred to in paragraph 10 of the Uniform Grain Storage Agreement is the inspection and grading referred to in the statute; concededly this was not performed by Curran on August 17, 1951. Cargill answers that paragraph 10 does not demand the statutory inspection needed for grading but only such as is required to determine that "deterioration cannot be prevented by conditioning." It relies not only on this being what the words say—still the most potent point on any question of interpretation—but on a claim that it would be absurd to require a warehouseman to delay informing a bailor of deterioration in the grain during the period required for an inspection of the sort necessary for grading. Commodity answers the latter argument on the basis that the last clause of paragraph 10 contemplates there may be a gap between the notice of the danger and the completion of the inspection which alone terminates the bailee's liability as insurer; and it says the importance of the statutory inspection is demonstrated by this very case, since such an inspec-

6. "Port of Albany Elevator No. 1
 "August 17th, 1951
 "Mr. R. L. Valentine,
 "Chief Commodities Division,
 "U.S.D.A. Production and Marketing Administration,
 "Commodity Credit Corporation,
 "139 Centre St.,
 "New York 13, N.Y.
 "My dear Mr. Valentine:—
 "I was instructed by Cargill Incorporated to examine all corn in store, including all corn on storage for Production and Marketing Administration at the Port of Albany, Elevator No. 1 Albany, N.Y.

 "My examination shows that this corn is on the danger line and if not exported immediately will not retain its present grade of No. 2 Yellow Corn.
 "Hoping that you can see your way clear to ship all Production and Marketing Administration corn immediately for your own protection, I remain.
 "Yours truly
 "/s/ Thomas J. Curran,
 Thomas J. Curran,
 "Custodian and Inspector in charge.
 "Copy to
 "C. C. Bodin
 "J. E. Bailey
 "M. Marshall."

tion would have settled the condition of the corn at the time. Cargill responds that while such an inspection might well be in the interests of the warehouseman or the bailor, that was something for them to decide.

■■ We think the natural meaning of the language is what Cargill asserts, namely, that the inspection required is an inspection to determine that deterioration cannot be prevented by conditioning. We do not believe "inspection" as used in the Agreement is a word of art, referring only to the statutory inspection for grade. Our construction is reinforced by comparison of the clause in the 1950 form with the corresponding clauses in the 1946 and the 1952 forms. Paragraph 16 of the 1946 form was satisfied simply by notice from the warehouseman that deterioration cannot be prevented by conditioning; there was no requirement of inspection by a licensed inspector. On the other hand, paragraph 10(c) of the 1952 form contains elaborate provisions including a specific requirement that the warehouseman "obtain an inspection and official grade determination based on a representative sample." Thus there was a progression from the 1946 notice of unpreventable deterioration by the warehouseman alone, through the 1950 requirement that this fact be confirmed by a disinterested official inspector, to the 1952 requirement which is what Commodity urges the 1950 provision to mean. Of course, the clarity of the 1952 clause as against the ambiguity of the 1950 clause is not conclusive—parties may always say better what they have previously said imperfectly but sufficiently; but the contrast reinforces our conclusion that the 1950 Agreement did not demand a grade determination.

The notice of August 17 was thus adequate if in fact Curran made a sufficient inspection to determine that deterioration could not be prevented by conditioning. Even on the construction which we adopt this was required—the inspection had to be a real one, not just a rubber stamp. The evidence on this is far from satisfactory. Curran himself was not called, although available to both sides. The District Judge is free to permit the record to be reopened to include Curran's testimony, or other evidence on this subject, if either side wishes to adduce it.

The judgment is therefore reversed and the cause remanded for proceedings by the District Judge consistent with this opinion.