**Richard F. FELKER, Plaintiff,**

v.

**PEPSI–COLA COMPANY and Pepsico, Inc., Defendants.**

**No. B–89 CV 491 (GLG).**

United States District Court, D. Connecticut.

Sept. 13, 1995.

---

Kevin Beuttenmuller, Rucci, Gleason, Craft & Burnham, Darien, CT, for plaintiff.

Robert T. Zielinski, Karl J. Sperstad, Ross & Hardies, Chicago, IL, for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

GOETTEL, District Judge.

This case, involving a claim of employment discrimination because of age, was tried to an advisory jury.[1]

### FACTUAL FINDINGS

The following facts are undisputed.[2] Plaintiff, Richard F. Felker, was an employee within the meaning of the Age Discrimination Employment Act, ADEA, 29 U.S.C. § 630(f). Defendants, Pepsi–Cola Company

---

1. The advisory jury was directed *sua sponte* by the Judge who originally had this case before its reassignment.

2. These factual findings were made while the advisory jury was deliberating. They have been slightly edited and transcript errors have been corrected.

and PepsiCo., Inc. are employers within the meaning of the ADEA Section 630(b). (The only involvement of PepsiCo, Inc. is as the parent company of Pepsi–Cola Company and consequently we will hereafter speak in the singular with respect to defendants, referring to them simply as "Pepsi"). This Court has venue and jurisdiction over the parties and the action.[3]

Plaintiff exhausted his administrative remedies through the Equal Employment Opportunity Commission and the New York State Division of Human Rights by the timely filing of the charges of age discrimination against Defendant on March 20, 1988 with the Division of Human Rights. To the extent that his claims may be severable with respect to a reassignment in February of 1987, the claims are timely to the extent that they constitute a single cause of action resulting in his ultimate termination of employment.

At all times relevant to this cause of action, plaintiff was in a protected class of employees as defined by 29 U.S.C. § 630(f), as his birth date is November 3, 1941. He was 45 years of age during the events recited herein.

Plaintiff was hired by Pepsi USA in 1975. He worked for Pepsi USA, a division of the Pepsi–Cola Company, until his termination of employment. Plaintiff was employed by defendant for approximately 12 and a half years until his termination on or about September 8, 1987. Despite his termination, his salary was continued for another couple of months. From his hiring in 1975 until 1984, Felker worked in a variety of jobs in Pepsi USA's sales territories in Washington State and in Kansas. In 1984, at age 42, Felker was promoted to the position of area business director in Pepsi USA's marketing operations department at Pepsi headquarters in Purchase, New York.

Pepsi USA was primarily responsible for the overall marketing of Pepsi brands and for maintaining the relationships between Pepsi and its independent franchise bottlers. Pepsi USA did not itself bottle and sell soda products. A separate division of Pepsi–Cola Company, known as Pepsi–Cola Bottling Group, operated the company-owned franchise territories.

Pepsi USA's marketing operations was a department which had a wide variety of duties. Part of the department was devoted to developing marketing programs and funding formulas for those programs under which Pepsi USA gave financial incentives to its bottlers to engage in certain sales or marketing related activities. These incentives were based on written agreements and conditioned upon the bottlers meeting requirements of a particular program. Another part of the department then actually dispersed the funds to the bottlers when the appropriate conditions were met and monitored the spending of these funds against preplanned budgets.

A third part of the department specialized in cold drink development, which was the development of equipment and marketing programs designed to encourage sales of chilled, ready to drink Pepsi products in areas outside of restaurants. Pepsi had several cold drinks in addition to Pepsi–Cola and Diet Pepsi, such as Mountain Dew, Mug Root Beer and Slice Lemon Lime Drink.

In May of 1985, at age 43, Felker was promoted to the position of business development director within the marketing operations department. This job involved supervision of the cold drink strategic planning and trade development groups within the marketing operations department. As of Felker's promotion, there were about fifteen employees in the three groups.

Felker was again promoted early in 1986 to the position of vice president of marketing operations. A vice president is described at Pepsi USA as being a junior executive. At the time of this promotion, Felker was 44 years old. Felker retained responsibility for the groups mentioned above, and in addition, became responsible for other groups within the department for a total of about 50 to 60 employees.

---

**3.** To the extent that any of the findings constitute conclusions of law, they are also set forth as conclusions of law.

During 1986, H.K. Kim Kelly became senior vice president of sales for Pepsi USA, and Felker began reporting to him. Kelly came to the company from outside the Pepsi family. As is customary in such an outside acquisition, after reviewing various parts of his organization, Kelly decided to make a number of organizational changes. Kelly decided to dismantle and eliminate the marketing operations department. Kelly stated that much of the function relating to dispersing funds properly belonged with the four field vice presidents of sales, who are ultimately responsible for the funds and meeting the sales targets that the funds were to be used for.

Kelly also indicated that he believed much of the marketing program development properly belonged within the brand marketing department, which was separate from sales. Finally, Kelly stated that the monitoring and tracking of the funds should be done by Pepsi USA's finance function and not in his sales department.

Accordingly, Kelly developed a plan to transfer all of these functions out of the headquarters' marketing operations department into other departments. Kelly implemented his plan to dismantle marketing operations gradually through 1986. This had the additional effect of reducing total personnel by about five percent.

At the end of 1986, the only function of the former marketing operations department which remained in the headquarters was the sales department, employing only eight or nine people. Because of this downsizing, Kelly decided it was not necessary to have a vice president running it. Thus Kelly eliminated Felker's job as vice president of marketing operations early in 1987.

Upon the elimination of Felker's position in February of 1987, Pepsi USA provided Felker with two options. First, Felker was offered the opportunity to become, on a special assignment basis, the general manager of an outside venture in which Pepsi had an interest, namely, OfficeMart, Inc. ("OMI"), with no loss of pay or benefits. Felker was told that if he did not want to accept the special assignment, Pepsi USA would continue his full salary and benefits until the end of the year, some ten months away, while he looked for alternate employment outside of Pepsi.

Felker was told that if he demonstrated sufficient line operating skills during the OMI assignment, he would be considered for other assignments back in Pepsi USA or in the Pepsi Bottling Group. There was, however, no guarantee that such positions would be made available to him at that time.

Felker elected to take the special assignment to manage OMI. OMI was a small start-up company that specialized in small office vending. OMI had been started by Lee Capital of Boston, a venture capital firm. OMI would provide refrigerated compact vending machines to an account, and then would periodically deliver soda which would be stocked into the machines for sales to employees or customers of the account. OMI specialized in smaller size accounts where the larger, full-size Pepsi vending machines could not be profitably used.

Plaintiff had already worked on the OMI project for several months prior to his full-time assignment to OMI. As such, he had approved defendant's payment of certain OMI expenses. Plaintiff was qualified to perform the functions of general manager of OfficeMart.

Pepsi USA had a contractual relationship with OMI. Pepsi did not have an actual ownership interest in OMI, but had extended a working capital letter of credit of up to $500,000 to OMI, to be drawn in monthly installments of no more than $50,000. In return, OMI agreed that a minimum percentage of its sales would be of Pepsi products, and that it would not sell or dispense Coca-Cola products through its machines or service. Pepsi's interest in OMI was to see if sales of its soda products could be profitably made by a third-party distribution company concentrating on small office markets such as OMI.

As part of its working agreement with OMI, Pepsi had some rights to obtain an ownership interest or partial ownership interest in the company in the future, if it chose to do so. That right was never exercised.

During the time that Felker was the general manager of OMI he was responsible for the presentation of several internal Pepsi business reviews of OMI. The business planning group assisted in the preparation of what Pepsi calls "decks" to use during these reviews, by preparing forecasts and financial analysis based on the underlying OMI data provided by Felker or OMI's accountants. These decks are a series of separate pages containing diagrams or brief statements, rather similar to what somebody at a sales presentation meeting would show to salesmen or customers. They were not extensive profit and loss or financial analyses of the company's operations. However, in these reviews, Felker reported on the results obtained by OMI, its cost of doing business, and its projected sales and profitability in a general way. In addition, Felker made various recommendations to Pepsi's senior executive on what steps should be taken in regard to the OMI venture.

Felker gave one such review to the president of Pepsi USA, Ron Tidmore, in July of 1987. At that time, Felker reported that OMI was very close to becoming profitable and that its cost of acquiring and maintaining this account base had fallen to acceptable levels. In this review, Felker recommended that Pepsi provide additional funding to OMI so that OMI could expand its products lines and expand into new areas. He also recommended that the costs of the vendors, as received by the bottling group, be reduced. Only this later recommendation was accepted by management.

During the time that Felker was general manager of OMI he authorized expenditures of approximately $500,000 of Pepsi USA funds. These funds were not related to the letter of credit amounts, even though the two figures are somewhat similar, if not identical, to purchase goods and services that were primarily to benefit OMI in its day-to-day operations. The requests for payment, which were approved by plaintiff, stated on their face that they were with respect to the OMI business ventures, which ultimately brought them to the attention of Pepsi's accountants. However, they were not submitted through Mr. Felker's superior, Mr. Kelly, for review, but were routinely paid by accounting.

Among those that appeared to be primarily for the benefit of OMI were funds used to pay legal fees incurred by OMI in regard to a lease and to purchase coffee urns, snack machines, and coolers which were delivered to OMI, to be placed with its customers. He spent over $200,000 of Pepsi USA funds on the development, printing and mailing of direct mailing advertising circulars and newspaper advertising designs to secure new customers for OMI.

Felker further used Pepsi funds to pay for training seminars and meetings for OMI employees. These expenditures were not directly reflected in the business reviews and reports that Felker gave to his superiors at the company. Certain of the expenditures, however, were conceded to be developmental and of benefit to the defendant. The authorized expenses included some paid before he went to become the general manager of OMI, and a number which were authorized but not necessarily paid during his period at OMI. These were, therefore, later approved after his termination by other Pepsi USA officers. These officers took the position that they had no alternative but to approve expenses since they had been authorized by Felker at a time that he was a company official.

While Felker was still managing OMI, Pepsi conducted an investigation of all of OMI's expenses paid by Pepsi through mid-August. Because of lag time in billing and payment, Pepsi did not actually pay out funds for the services delivered to OMI until weeks or months after the expenses had been incurred. Pepsi USA's financial department did not discover the expenditures until mid-August of 1987. Its initial problem concerned the account to which the expenses were charged. The expenditures had been made from a relatively small account of $400,000, which was a subpart of a departmental budget of more than $40 million.

After the expenditures were discovered, Felker's supervisors conducted a thorough investigation and review. Upon the investigation and review, Felker's superiors concluded that his expenditures of these funds were inappropriate. Some of Felker's supe-

riors believed that the expenditure of the funds, without reflecting them in OMI's business results, was dishonest, and artificially bolstered the results he obtained while overseeing OMI. They also believed these funds were a gross misuse of Pepsi funds. Others believed that it merely showed naivete or lack of business judgment. In either event, they determined that his employment should be terminated.

Plaintiff claims that he was not given an opportunity to explain his actions. (His superiors testified that he was given such an opportunity). It is clear that he articulated a justification for the spending, in that he thought that it would benefit Pepsi by helping reduce a backlog of compact vendors that had occurred and provide channel development benefits for the defendant.

To the extent that he convinced the financial officers at Pepsi that these were development expenses, they then listed them under the heading, "channel development" expenses. They claim that they give him a wide leeway in this regard, resolving all reasonable disputes to his benefit. As indicated earlier, that amounted to roughly a couple of hundred thousand dollars worth of expenses.

The failure to include all these expenses in the business reviews caused OMI to appear to be more profitable than it actually was. In addition, improving the appearance of OMI's results made the plaintiff appear to be a more successful manager.

Felker testified that his immediate superior during a part of this period, Mr. Kelly, was aware that funds were being spent in this respect. Although Kelly denied this, it is apparent that this project, which started before Kelly arrived, was not one to which Kelly had devoted a lot of attention. It would appear that at least a part of the responsibility for failing to detect any budget misappropriations was Mr. Kelly's. An additional cause was a systems problem at Pepsi USA itself. Although Felker had been detached and sent to a separate business venture, because he continued on the rolls as a vice president, he maintained the ability to approve budget expenses even though he no longer had any direct responsibility for that budget. Whose failing this was at Pepsi

USA was never the subject of any evidence, but their financial people acknowledged that it was a defect in the system.

OMI had been hoping to attract additional investors through a prospectus. The draft prospectus indicated that Mr. Felker would become the president of the company, that markets would be expanded to other cities, and that he would have his headquarters in San Francisco. The draft prospectus was not kept secret from Pepsi. Felker gave it to his new superior, Mr. House. In October of 1987 the stock market took a very precipitous plunge, which ended any possibility of attracting investors.

In addition, Pepsi USA had directed Felker not to attend a meeting with prospective investors around the beginning of September and, as noted, terminated his connection during the month of September. No one from Pepsi completely replaced him, in effect as the general manager of the company, although Mr. House and others looked after certain aspects from their New York headquarters, and on at least one occasion, one of the accounting executives visited OMI.

It appears that within a month or so of these two adverse developments, namely, the termination of Mr. Felker and the collapse of the stock market, a decision was reached by both Lee Capital and Pepsi to wind up Pepsi's involvement in OMI. The windup then took a couple of more months, perhaps running into early 1988. When all the books were balanced on Pepsi's loans and direct payments, but not including the cost of Mr. Felker's services, Pepsi lost at most a small amount plus the value of Mr. Felker's services. On the other hand, it did get certain exposure and information concerning the use of direct marketing techniques such as telemarketing and direct mail.

Felker remained in the position of general manager of OMI until his termination in September of 1987. His salary and benefits were continued for a couple of months thereafter. After termination, Felker obtained employment with a company called Multimix Incorporated and subsequently started his own business—F & N Enterprises. In both of these capacities he had a substantial in-

come, and with his own business he has realized substantial profits. Consequently, he mitigated his damages properly.

### The Jury Verdict

The advisory jury returned its special verdict sheet with the following findings.

1. Did Plaintiff Richard Felker establish by a preponderance of the evidence that the reasons offered by defendant Pepsi–Cola for his· discharge were a mere pretext for terminating his employment?

   YES   X      NO ____

2. Did Plaintiff establish by a preponderance of the evidence that age was a determinative factor in his discharge?

   YES   X      NO ____

**IF YOU ANSWERED "NO" TO EITHER QUESTION 1 OR 2, YOUR DELIBERATIONS ARE COMPLETE AND YOU SHOULD REPORT YOUR FINDINGS TO THE COURT.**

3. Do you find that Richard Felker would have received any promotions if he had not been discharged by Pepsi–Cola?

   YES   X      NO ____

4. If you found that Richard Felker would have been promoted, what grade level would he have attained?

   Grade ___16___   Date Within two years of actual termination (87–89)

5. Enter the amount of back pay, including bonuses, to which Plaintiff would have been entitled had he not been discharged:

   $ 1,240,000

6. If you find that the plaintiff would have received benefits from a stock plan, set forth the amount he would have received to date had he not been discharged:

   $ 51,270

7. As a set-off against back pay, enter the amount of income that you find the plaintiff has earned in mitigation of his damages since the time of the violations:

   $ 338,629

8. Enter the amount of future damages from lost pay and bonuses, as well as stock benefits, that the plaintiff has proven by a preponderance of the evidence, after deducting his earnings in the future:

   $ 1,567,849

9. Did defendant Pepsi–Cola wilfully violate the federal law against age discrimination?

   YES   X      NO ____

### CONCLUSIONS OF LAW

█ A threshold question is how much deference should be given to the advisory jury's verdict. Since the passage of the current Federal Rules in 1939, the Second Circuit Court of Appeals has made clear that a judge sitting with an advisory jury must make his or her own decision of the case, and is free to ignore the findings of the jury. *Ragin v. Harry Macklowe Real Estate Co.,* 6 F.3d 898, 907 (2d Cir.1993); *Mallory v. Citizens Utilities Co.,* 342 F.2d 796, 797 (2d Cir.1965); *Major v. Phillips–Jones Corp.,* 192 F.2d 186, 189 (2d Cir.1951), *cert. denied,* 343 U.S. 927, 72 S.Ct. 760, 96 L.Ed. 1338 (1952); *(American) Lumbermens Mut. Cas. Co. v. Timms & Howard, Inc.,* 108 F.2d 497, 500 (2d Cir.1939).

Fed.R.Civ.P. 52 requires the Court, although sitting with an advisory jury, to make its own findings of fact and conclusions of law. Indeed it has been held in this Circuit that Rule 52(a) requires the Court to make its findings independent from the jury's. *Cargill, Inc. v. Commodity Credit Corp.,* 275 F.2d 745, 746 (2d Cir.1960). On the other

hand, it would be purposeless to have an advisory jury unless some deference was shown to its opinions. Moreover, decisions in this Circuit have indicated a preference for a jury's verdict over the findings of a District Judge. *See e.g., Wade v. Orange County,* 844 F.2d 951, 954–955 (2d Cir.1988). Consequently we approach the jury's findings with a degree of deference but without feeling obligated to follow them.

The advisory jury's findings, if followed, would result in a plaintiff's verdict in the amount of $5,040,980. However the jury's verdict is clearly wrong in some respects and highly questionable in others.

■ It is clear that the plaintiff proved a prima facie case in that he was in the protected age group, was performing his job adequately and had his employment terminated. Although Mr. House, who was some seven or eight years younger, did undertake certain of his responsibilities, he was not replaced as such, in that his duties to the extent they continued, were assigned to a number of other persons. (In addition the plaintiff's former secretary worked for Mr. House for a period of time.) However, in a claim for age discrimination, it is not necessary to establish that the plaintiff was replaced by a younger person providing that he can show from other evidence that he suffered adverse employment action because of his age.

The jury's first finding, that the reasons for discharge were a mere pretext for terminating Felker's employment, can be upheld only on the following grounds. Clearly the direct payments for OMI expenses, made at the same time Pepsi was advancing loans to the company (which loans gave Pepsi some rights to convert into stock holdings if they desired), were an error from both a financial and accounting standpoint.[4] The financial and accounting departments were justifiably troubled by the situation. However the jury could, and perhaps did, find that the termination of the plaintiff's employment was effected to obscure lax supervision by his supervisors and ineffective accounting proce-

dures which continued to allow a detached vice president to draw against a budget for which he no longer had any responsibility. By terminating Felker's employment, the responsibility of others was concealed.

The critical jury findings, however, were that age was a determinative factor in his discharge and that Pepsi willfully violated the federal laws against age discrimination (jury findings 2 and 9). Before considering those findings we will briefly discuss some of the others.

### DAMAGES FINDINGS

■ Jury findings (3 and 4) that Felker would have received promotions had he not been discharged, are highly speculative. The only evidence offered concerning promotion possibilities indicated that there were more than 150 people in plaintiff's competitive level (not including outside candidates) and only 30 jobs at the higher level to which the jury assumed plaintiff would have been promoted within two years of his actual termination. While there certainly is authority for including promotion possibilities in back pay awards, *see e.g., Malarkey v. Texaco,* 983 F.2d 1204, 1214 (2d Cir.1993), more than a mere possibility must be shown to make such a finding. Plaintiff's expert gave no evidence as to whether plaintiff would have been promoted. He simply took it as a hypothetical possibility.

The jury's finding (7) as to the set off against back pay from income earned in mitigation, is clearly in error. They came up with a figure of $338,629. Plaintiff concedes that the sum, if limited to earnings, should have been $901,371 (an error, when doubled for willfulness, of over $1,000,000). Plaintiff concludes that the error was made by subtracting from the back pay award the earnings plaintiff received, thereby coming up with a net figure of back pay lost. We believe plaintiff's conclusion to be correct, although the Court clearly told the jury not to do that.

4. There may also have been adverse tax consequences to making such payments. However this is a complex area that we need not pursue.

■ There is an even greater area of error in that computation and it affects the finding as to future damages (jury finding 8) as well. Besides Felker's salary, the business which he now runs, of which he is the principal owner, had substantial profits during the last few years (some $700,000).[5] When this sum is added into his salary, as it should have been since he paid federal taxes on it and had the ability to withdraw it whenever he wished, the plaintiff has suffered no back pay loss even including the value of his Pepsi-Cola pension.[6] Also, if the company continues to be profitable, he would have no future damages even if we accept the notion that he would have been promoted to a higher level.[7]

We consequently would refuse to adopt jury findings 3, 4, 7, and 8, even were we not to disagree with the jury's basic liability findings.

### FINDING OF LIABILITY

■ While the decision to terminate plaintiff's employment may have involved considerations other than his lack of business judgment, it clearly had nothing to do with his age. He was only 45 and had been promoted three times in the preceding four years. Indeed he was advanced to vice president in the preceding year. The testimony of the decision makers gave no indication that plaintiff's age had any role in his discharge.[8]

Plaintiff submitted a forty-one page post-trial brief attempting to support the jury's verdict. In great part it was directed to the question of whether the plaintiff's employment should have been terminated. The only aspect of it which touched on age at all was the fact that Mr. House, who succeeded to some of plaintiff's duties and employee supervision, was seven or eight years younger. That fact is far from sufficient to support the conclusion that age was a determinative or motivating factor. The plaintiff's job was completely eliminated in February of 1987 and the position to which House was appointed did not occur until months later. All but eight or nine of the 50–70 employees in marketing operations were transferred out of the department into other parts of Pepsi-Cola. With respect to OMI, House served only the role of overseeing the process of winding down Pepsi's involvement. He spent only a small part of his time on that project and clearly never functioned as president or general manager of OMI. There was no statistical or anecdotal evidence of other older workers having been terminated improperly.

In the final analysis, support for plaintiff's liability verdict rises or falls with the recent decision of the Second Circuit in *Binder v. Long Island Lighting Co.*, 57 F.3d 193 (1995). There the Court held that the trial judge should not have granted judgment notwithstanding the verdict, since the jury was entitled to draw an inference of age discrimination upon its rejection of the defendant's proffered business reason. The critical and most controversial part of that decision is Judge Winter's statement that "a trier of fact may thus *generally* infer discrimination when it finds that the employer's explanation is unworthy of credence." 57 F.3d at 200 (emphasis added). The word "generally" has

---

5. Plaintiff testified that because Arizona, where he now lives, is a community property state, and also for purposes of estate planning, his wife owns one-half of his stock. However, the annual reports of the corporation filed with the state indicated that he was the sole owner. The same was true of the corporation's federal tax returns. Clearly it was the plaintiff's services that produced these profits and not those of his wife, who had only minor involvement with the company's activities.

6. Plaintiff's expert double counted pension benefits because his calculations included an award of back pay which would have given plaintiff future credit toward the years of service covered by the award as well as an amount for loss of pension including the same years of service.

7. Plaintiff's expert calculated huge future damages based on his understanding that the plaintiff would participate in two separate types of stock plans. He had no evidence in that regard but accepted it as a hypothesis for his figures. The evidence clearly showed that he would not have been in both plans at once and, moreover, the assumptions made about the stock plans for higher level employees were totally in variance with the facts.

8. The only evidence concerning discharge for similar reasons (improper budget expenses resulting in termination) concerned two managers in their twenties.

several meanings but the one most strongly suggested in context is "usually." [9]

If we construe it as meaning usually, it could be taken as directing that an inference of discrimination exists if pretext is first found. On the other hand, the cases cited in support of the proposition, *Saulpaugh v. Monroe Community Hospital*, 4 F.3d 134, 142 (2d Cir.1993), *cert. denied*, — U.S. —, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1994) and *DeMarco v. Holy Cross High School*, 4 F.3d 166, 170 (2d Cir.1993), both merely stand for the established proposition that a finding of pretext when combined with a prima facie case, *permits*, but does not require, a finding of discriminatory intent. Moreover the Supreme Court decision in *St. Mary's Honor Center v. Hicks*, — U.S. —, —, 113 S.Ct. 2742, 2755, 125 L.Ed.2d 407 (1993) clearly holds that

> Title VII does not award damages against employers who cannot prove a non-discriminatory reason for adverse employment action, but only against employers who are proven to have taken adverse employment action by reason of (in the context of the present case) race. That the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason of race is correct.

Assuming that Judge Winter did use "generally" as meaning "usually," he may well have been saying it as an observation of what, in fact, occurs in the trial courts, rather than as a legal conclusion. In the last few years, I have presided over a number of employment discrimination cases with juries. In most of those cases the jury focused on determining whether the adverse employment action (usually discharge) was proper in their opinion. Not surprisingly, since most of them are or have been employees and few of them have been employers, they found that the employment action was wrong. Having so found, they move on to the conclusion that it must have been due to the type of claimed discrimination—race, sex, religion, national origin or age—even though the evidence supporting that conclusion is very slight. Stated more simply, if the jury finds that the employee should not have been discharged it will "usually" (i.e. generally) infer impermissible employment discrimination.

At a formal gathering in federal court recently, one of Connecticut's leading employment law practitioners stated that employment discrimination laws were being used to abolish the existing law (in Connecticut and most states) that, absent a contract, employment is at will. He stated that by use of these discrimination laws all employees in the future will be found to have a property right in their job, from which they cannot be removed without just cause (and presumably procedural hearing safeguards). Whether one agrees with this goal is a matter of personal opinion.[10]

■ It is, however, abundantly clear that the Congressional purpose in passing Title VII and the ADEA was to end discrimination on improper grounds such as race, sex, religion, national origin and age, and not to confer property rights on employees or to dramatically change the existing rights of employers. While the trial courts have limited (if any) ability to overturn unfounded jury verdicts, *Binder, supra*, 57 F.3d 193, or to grant summary judgment in employment discrimination cases, since intent is involved, *see Gallo v. Prudential*, 22 F.3d 1219 (2d Cir. 1994), at least for the present, within the context of an advisory jury we have no such restraint. Consequently, this Court finds

---

**9.** Webster's Ninth Collegiate Dictionary defines "generally" as meaning "in a general manner; as *a:* in disregard of specific instances and with regard to an overall picture ... *b:* as a rule: USUALLY." Webster's Third New International Dictionary Unabridged has a somewhat more complicated definition including other possibilities such as "UNIVERSALLY" and concluding with "on the whole: as a rule." However its first meaning is given as "in a general manner." A definition of the word does not appear in any of the standard legal dictionaries consulted.

**10.** It must be acknowledged that federal judges have such protections since they are appointed for life on good behavior. However, the activities of trial judges are subject to the continual review of the appellate courts and the decisions of the appellate courts are given such wide public exposure that all federal judges are under employment constraints far exceeding those of the average worker.

that plaintiff did not establish by a preponderance of the evidence that age was a determinative or motivating factor in his discharge, or that defendant wilfully violated the federal laws on age discrimination. Therefore, we direct that the Clerk enter judgment for the defendant.

**SO ORDERED.**