ANNINA D'ALOISIO *vs.* MORTON'S INC. & another.[1]

Suffolk.     December 8, 1960. — March 14, 1961.

Present: WILKINS, C.J., SPALDING, WILLIAMS, CUTTER, & KIRK, JJ.

*Bailment. Contract,* Limiting liability, Of bailment, What constitutes.
*Evidence,* Evidence binding a party. *Agency,* Interpreter. *Negligence,*
Contractual limitation of liability. *Conversion. Practice, Civil,* New
trial.

A "storage receipt and contract," given to the owner of a coat when she
left it with a bailee for storage and repair and signed by her below a
statement that she had "read the reverse side" on which appeared certain
provisions as to value declared by her and limitation of the bailee's
liability, was not a mere "means of identification" of the property bailed
but was a contract, so that she was bound by the limitation of liability
in the absence of fraud, whether or not she could or did read the con-
tract.   [234]

A woman who spoke and understood "little or no English" and who, al-
though present when her coat was left with a bailee for storage and
repair, dealt with the bailee through her daughter, a college student,
was concluded by such representation of her by the daughter notwith-
standing any failure or inability of the daughter to interpret the con-
versation with the bailee accurately and fully, and, in a subsequent
action against the bailee, was bound by the daughter's testimony as to
her understanding of the transaction.   [234–235]

Under a contract of bailment of a coat for storage and repair providing
that the charges were based on the value of the coat declared by the
owner, that the declared value was "agreed to be the value . . . for the
purposes of this contract," and that the bailee's liability for loss of the
coat "from any cause, including the negligence of" the bailee, should be
"limited" to the declared value, the owner, who understood that she
could obtain a higher limit of liability by paying a higher charge, could
not recover from the bailee damages greater than the declared value for
breach of the contract or ordinary negligence upon subsequent loss of
the coat by the bailee.   [235]

Provisions of a contract of bailment limiting the amount of the bailee's
liability for loss of the bailed article "from any cause, including the
negligence of" the bailee, would not protect him in the event of a wilful
conversion of the bailed article by him for his own benefit.   [237]

Mere acceptance of an article for storage by an unlicensed warehouseman
would not be made a conversion of the article by G. L. c. 105.   [237–238]

[1] Halmor, Inc.

D'Aloisio *v.* Morton's Inc.

On the record of an action in a District Court brought by the owner of a coat against a bailee thereof after it "could not be located" on demand, where the trial judge found for the plaintiff on counts for negligence and conversion and the Appellate Division vacated such findings and ordered judgment for the plaintiff on the negligence count in a smaller amount by reason of a limitation of liability in the contract of bailment, this court, in view of certain erroneous rulings by the judge and uncertainties as to his findings respecting conversion, reversed the Appellate Division's order, vacated the findings for the plaintiff, and ordered a new trial.   [238–239]

CONTRACT OR TORT.   Writ in the Municipal Court of the City of Boston dated December 18, 1958.

The action was heard by *Shamon*, J.

*Samuel A. Valenti*, for the plaintiff.

*Edward O. Proctor, Jr.*, for the defendants.

CUTTER, J.   This is an action of tort or contract.   The evidence appearing in the report to the Appellate Division is stated in its aspect most favorable to the plaintiff.   On May 15, 1958, the plaintiff, who "speaks and understands little or no English," accompanied by her daughter, a nineteen year old college student who acted for her, left her mink coat for storage and repair with Halmor, Inc. (Halmor), a wholly owned subsidiary of Morton's Inc.   She received a "storage receipt and contract" on which appeared the name "Morton's," and which limited the bailee's liability[2] to $300, the coat's value as declared by the plaintiff. The plaintiff could have been protected up to a higher maximum by paying a storage charge equal to two per cent of whatever valuation she chose to place on the coat.   The daughter translated at least some of the conversation with

---

[2] Pertinent provisions of the contract included: "3. The value declared by the depositor . . . [of] each article . . . is agreed to be the value of such article for the purposes of this contract and varying rates are offered . . . dependent upon such declared value.   In consideration of the charge based on the value declared . . . it is agreed that the liability of Morton's for loss or damage to any article from any cause, including the negligence of Morton's shall be limited to the amount of such declared value or the cost of repair or replacement . . . whichever amount is least, except that in no event shall the liability of Morton's exceed the actual value . . . .   4.   In further consideration of the charges . . . Morton's hereby agrees to effect insurance for the benefit of the depositor for the value set opposite each article, which insurance shall . . . cover the articles against loss by fire and theft . . . .   7.   The articles may be stored or processed at any place selected by Morton's without notice to the depositor."

Wise, the representative of Halmor, to her mother. The daughter knew what a minimum charge was and that her mother "by paying a larger charge . . . could have more insurance." The plaintiff herself said hardly anything and did not understand that she could have insured the coat for a larger amount if she was willing to pay a higher charge, as her daughter failed to tell her.

"On the same day" on which the plaintiff's coat was left with Halmor, it "was sent to the alteration shop . . . for the purpose of having the cuffs tacked. There is no evidence as to the whereabouts of . . . [the] coat after that time."

In the autumn of 1958, the "plaintiff and her daughter . . . dropped in to Halmor . . . and asked . . . [that] the coat" be sent to them. "They were told that they would have it in about a week." Later the daughter was informed that there had been "difficulty in locating it. A thorough search was . . . made by both defendants, but . . . [the] coat could not be located." The plaintiff was tendered $300, "the claimed limit of liability, which [the] plaintiff refused."

At the trial the judge found for the defendant Morton's on a count for conversion of the coat, and for the plaintiff against Halmor in the sum of $2,050 on count 2, a count for negligence, and on count 3, a count for conversion. The defendants filed requests for rulings, in essence (No. 1) that the plaintiff was bound by the contract, regardless of whether she read it, and by the limitation of liability therein, in the absence of fraud; (No. 2) that the document was a contract and not a cash receipt; and (No. 4) that there was no evidence supporting a finding for the plaintiff in excess of $300. Requests numbered 1 and 2 were denied as "inapplicable to the facts found." Request numbered 4 was denied.

The Appellate Division vacated the trial judge's findings for $2,050 on count 2 (negligence) and on count 3 (conversion) and ordered judgment for the plaintiff for $300 on count 2. The plaintiff appealed.

D'Aloisio *v.* Morton's Inc.

1. We consider first the judge's refusal of request numbered 2, in effect that the "storage receipt and contract" is a contract as a matter of law. "Where what is given to a plaintiff purports on its face to set forth the terms of a contract, the plaintiff, whether [s]he reads it or not, by accepting it assents to its terms, and is bound by any limitation of liability therein contained, in the absence of fraud," of which here there was no evidence. See *Kergald* v. *Armstrong Transfer Exp. Co.* 330 Mass. 254, 255–256, where the relevant decisions are collected. See also *Polonsky* v. *Union Fed. Sav. & Loan Assn.* 334 Mass. 697, 701; *Mustard* v. *Eastern Air Lines, Inc.* 338 Mass. 674, 676–677. The plaintiff is bound regardless of her ability to read. See *Cohen* v. *Santoianni,* 330 Mass. 187, 193. In the *Kergald* case, it was also said that, where "what is received is apparently a means of identification of the property bailed, rather than a complete contract, the bailor is not bound by a limitation upon the liability of the bailee unless it is actually known to the bailor." A baggage check was there held to be within the category of "means of identification" rather than a complete contract.

The "storage receipt and contract" personally signed by the plaintiff was plainly so marked. Her signature appeared immediately below the words in legible capital letters "I have read the reverse side hereof." On the reverse side appeared the provisions already mentioned (see footnote 2). Above the figure of $300 inserted as the "valuation by customer" on the front of the contract appeared the words "liability not exceeding." It could not properly have been ruled that this "storage receipt and contract" was merely a "means of identification." Requested ruling numbered 2 should have been given.

The plaintiff is concluded by the representation of her by her daughter, notwithstanding any failure or inability of her daughter to interpret the conversation with Wise accurately and fully. See *Commonwealth* v. *Vose,* 157 Mass. 393, 394–395; Restatement 2d: Agency, § 14E. In the cir-

cumstances, the plaintiff is also bound (see *Hannon* v. *Hayes-Bickford Lunch Sys. Inc.* 336 Mass. 268, 273) by her daughter's testimony as to her understanding. Request numbered 1 should also have been given.

2. The parties contracted with respect to an agreed valuation of the bailed article. The plaintiff could have obtained a higher limit of liability by paying a higher rate. The daughter's testimony about her understanding of the contract shows that she realized the possibility of a higher insurance "by paying a larger charge." In the circumstances, the limitation of liability in the storage receipt and contract is binding not only with respect to recovery on the contract of bailment but also with respect to recovery for ordinary negligence. This is the rule as to charges by carriers. See *Bernard* v. *Adams Exp. Co.* 205 Mass. 254, 258–261; *Johnson* v. *New York, N. H. & H. R.R.* 217 Mass. 203, 207; *McKinney* v. *Boston & Maine R.R.* 217 Mass. 274, 275; *Mustard* v. *Eastern Air Lines, Inc.* 338 Mass. 674, 678; Restatement: Contracts, §§ 574, 575 (2). See also *Bigelow, Kennard & Co. Inc.* v. *Boston,* 254 Mass. 53, 56–57. Cf. *Aradalou* v. *New York, N. H. & H. R.R.* 225 Mass. 235, 238, 242; *Henderson* v. *Canadian Pac. Ry.* 258 Mass. 372, 376–377. The doctrine of these cases is equally applicable to warehousemen and other persons providing storage facilities. See G. L. c. 105, § 10;[3] *Samelson* v. *Harper's Furs, Inc.* 144 Conn. 368, 371–373; *George* v. *Bekins Van & Storage Co.* 33 Cal. 2d 834, 845–848; Prosser, Torts (2d ed.) § 55, p. 307; Williston, Contracts (Rev. ed.) § 1046; Corbin, Contracts, § 1472 (see also §§ 1068–1069). See also *Page* v. *Ace Van & Storage Co.* 87 Cal. App. 2d 294, 297–299; *Eckel* v. *Trencher Furs, Inc.* 191 Misc. (N. Y.) 14, 15–16; Harper & James, Torts, § 21.6, p. 1188, n. 14. Cf. *Wainwright* v. *Massachusetts Storage Warehouse Co.* 219 Mass. 247, 249–250 (recovery permitted on oral contract of storage without consideration of later written agreement); *Taccetta* v. *Chauncey Rice & Rogovin, Inc.* 75 F. Supp. 373, 374 (S. D.

---

[3] The generally comparable provisions of the Uniform Commercial Code are found in G. L. c. 106, § 7–204. See also § 1–102 (3). See footnote 4, *infra.*

N. Y., apparently based on language of receipt); *Voyt* v. *Bekins Moving & Storage Co.* 169 Ore. 30, 47 et seq.   It is generally recognized, however, that contractual limitations of liability do not protect a bailee or warehouseman against at least a wilful and intentional conversion for its own benefit.   See *Menuez* v. *Julius Kindermann & Sons, Inc.* 19 F. Supp. 7, 8 (S. D. N. Y.); *Glinsky* v. *Dunham & Reid, Inc.* 230 App. Div. (N. Y.) 470, 471–472; *Kaplan Prod. & Textiles, Inc.* v. *Chelsea Fireproof Storage Warehouse, Inc.* 9 Misc. 2d (N. Y.) 273; *French* v. *Bekins Moving & Storage Co.* 118 Colo. 424, 429 ("conversion must be by misfeasance" and not by negligence to avoid limitation clause); annotation 99 A. L. R. 266.  See also Restatement: Contracts, § 575 (1); *Rappaport* v. *Storfer Bros. Inc.* 2 Misc. 2d (N. Y.) 395, 396–397.

3.   We need not determine whether the evidence warranted a finding that Halmor was negligent or that (because it was acting as, or as agent for, a warehouseman) it had not satisfied the warehouseman's statutory burden of proof that it was not negligent, existing under G. L. c. 105, § 15.[4]   This section provides that if a "warehouseman . . . fails to deliver the goods in compliance with a demand . . . accompanied [by certain tenders], the burden shall be upon . . . [him] to establish the existence of a lawful excuse for such . . . failure."   See *Rudy* v. *Quincy Mkt. Cold Storage & Warehouse Co.* 249 Mass. 492, 493–495.  See also *Denning Warehouse Co.* v. *Widener,* 172 F. 2d 910, 912–913 (10th Cir.); *George* v. *Bekins Van & Storage Co.* 33 Cal. 2d 834, 839–840.   Cf. *Bellows* v. *Worcester Storage Co.* 297 Mass. 188, 192–193, referring to the common law rule as to

---

[4] The provisions of G. L. c. 105, §§ 7–54, inclusive, and §§ 65 and 66, have been repealed by St. 1957, c. 765, § 2, which has substituted, effective October 1, 1958, various provisions of art. 7 of the Uniform Commercial Code, now G. L. c. 106, beginning with § 7–101.   General Laws c. 105, §§ 1 to 6, and §§ 55 to 64, each inclusive, were not repealed by St. 1957, c. 765, § 2.   Provisions relating to the subject matter of G. L. c. 105, § 15, are found now in G. L. c. 106, § 7–403 (1) (b).  See comment in 1957 Ann. Surv. Mass. Law, § 8.3, but we, of course, have no occasion to consider whether this comment correctly interprets § 7–403 (1) (b).   The record is not clear when demand for the coat's return was made.   Upon the present record, the repealed provisions still governed this transaction which had its inception in May, if those provisions are applicable at all.  St. 1957, c. 765, § 19.

burden of proof of negligence or fault of a bailee; *Hanna* v. *Shaw,* 244 Mass. 57, 61; *Sandler* v. *Commonwealth Station Co.* 307 Mass. 470, 473; *National Dock & Storage Warehouse Co.* v. *United States,* 27 F. 2d 4, 6–8 (1st Cir.); *Castorina* v. *Rosen,* 290 N. Y. 445, 447–448; Wigmore, Evidence (3d ed.) § 2508; McCormick, Evidence, § 309. Cf. also *Cargill, Inc.* v. *Commodity Credit Corp.* 275 F. 2d 745, 751–753 (2d Cir.); annotation, 13 A. L. R. 2d 681, 685 et seq. Even if Halmor was liable for negligent loss of the coat, the limitation of liability would be applicable, either in an action on the contract of bailment or in tort.

4. The contract would not operate to limit Halmor's liability at least for a wilful conversion for Halmor's own benefit. If such a conversion has been established, the plaintiff could recover more than $300 on the count for conversion.

The trial judge found that Halmor "exercised complete dominion . . . over . . . [the coat] inconsistent with the plaintiff's title and that when it failed to return the coat upon . . . demand, it converted" it. There was, however, no evidence sufficient to support a finding of conversion by any affirmative act of dealing with or misdelivery (cf. *Baer* v. *Slater,* 261 Mass. 153, 154–155; *Jacobson* v. *Richards & Hassen Enterprises, Inc.* 172 F. 2d 464, 466 [2d Cir.]) or misappropriation of the coat by Halmor or by any agent of Halmor. See *George* v. *Bekins Van & Storage Co.* 33 Cal. 2d 834, 838.

It is argued that Halmor committed a conversion when it obtained possession of the coat by a "tacit representation that . . . [it] was operating its fur storage according to the laws of the Commonwealth." Halmor was not in fact licensed under G. L. c. 105, § 1 (as amended through St. 1935, c. 310, § 1), although its parent corporation, Morton's Inc., was a bonded warehouse, licensed under c. 105. Chapter 105, however, did not expressly purport to make acceptance of goods for storage by an unlicensed warehouseman in itself a conversion. At most it provided a penal sanction for violation of the statute. See G. L. c. 105,

§ 2; *Mezullo* v. *Maletz,* 331 Mass. 233, 238–240.    The trial judge incorrectly found a conversion on this ground.

The evidence did not warrant a finding that Halmor committed a conversion by obtaining possession of the coat by misrepresentation or deceit.    It was not shown that in May, at the time of the deposit of the coat, Wise or Halmor made any false representation, that there was any intention to deceive the plaintiff, or that the plaintiff relied on any representation.    Cf. Harper & James, Torts, § 2.16.    Cf. also *Dean* v. *Ross,* 178 Mass. 397, 401–402; *Hagar* v. *Norton,* 188 Mass. 47, 50; *Stadmiller* v. *Schirmer,* 248 Mass. 244, 248–249; Restatement: Torts, §§ 221 (b), 252, comment d.

So far as the plaintiff relies to prove a conversion, as distinguished from a default under the contract of bailment, upon Halmor's failure to return the coat after demand, it must appear that Halmor still had the coat at the time of the demand in the autumn and was able to comply with the demand.    See *De Young* v. *Frank A. Andrews Co.* 214 Mass. 47, 50; *Premium Cut Beef Co.* v. *Karp,* 318 Mass. 229, 230–231; *Marshall Vessels, Inc.* v. *Wright,* 331 Mass. 487, 489; Restatement: Torts, § 237, comment d; Prosser, Torts (2d ed.) § 15; Harper & James, Torts, § 2.27.    The only basis in the record for inferring that Halmor had the coat when demand was made was that the coat was in its possession on May 15, when it was received and sent to the sewing room, and that it could not be found.    The report to the Appellate Division indicates that an unsuccessful search was made for it in the autumn but the report contains no detailed statement of the testimony about what Halmor did to discover and explain the cause and facts of the coat's disappearance.    Whatever might have been the case if the period had been short, there is in the circumstances slight basis for inferring that Halmor had the coat in the autumn merely because it had it in May.    See *Maggio* v. *Zeitz,* 333 U. S. 56, 64–67.    Considerations bearing against the reasonableness of such an inference (see *Janevesian* v. *Esa,* 274 Mass. 231, 233; *Lioni* v. *Marr,* 320 Mass. 17, 21) are the serious consequences to a bailee, under the

criminal law and in terms of business reputation, if discovered refusing delivery of an item, actually in the bailee's possession, to one clearly entitled to its return.

The trial judge made no express finding that Halmor had the coat when demand was made. Indeed, it is not clear whether he directed his attention to that issue at all. The implication of one of his findings is that the coat was lost in or stolen from the sewing room because of Halmor's negligence. His finding "that thereafter the coat was never located" seems inconsistent with any finding that Halmor had the coat when demand was made. We should not imply, without a more specific statement to that effect by the judge, a finding of deliberate failure on Halmor's part to return to the plaintiff a coat actually in its possession to which she was clearly entitled. Nevertheless, in a case involving summer fur storage where the coat ordinarily would not be redelivered until autumn, we cannot say that an inference that Halmor still had the coat in the autumn at the time of demand could not have been drawn in the absence of more explanation by Halmor about what in fact happened. Request numbered 4 could not have been given, because the limitation of liability would not have protected Halmor for a wilful failure to redeliver the coat if it had control of the coat when demand was made. In view, however, of the uncertainty, already mentioned, about the judge's findings, we cannot say that Halmor was not harmed by the erroneous rulings on requests numbered 1 and 2 as to the nature and effect of the storage receipt and agreement. The order of the Appellate Division is reversed. The findings for the plaintiff are vacated. It is ordered that there be a new trial.

*So ordered.*