[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
Plaintiff Priority Finishing Corporation brings this action against Defendant Hartford Steam Boiler Inspection and Insurance Company in three counts to recover damages for breach of an insurance contract, breach of covenant of good faith and fair dealing, and violation of the Massachusetts statute prohibiting unfair trade practices.
Since the insurance contract at issue was entered into in Massachusetts, by parties located in Massachusetts, and had its operative effect and place of performance there, the laws of that Commonwealth govern this action. Williams v. State Farm MutualAuto Insurance Co., 229 Conn. 359, 366 (1994). The parties agree on this issue.
The facts are as follows: Priority Finishing Company, hereinafter Priority, is a Connecticut corporation with its principal place of business in Fall River, Massachusetts. Priority is a specialty dyer and finisher of fabrics. It processes between 500,000 and 600,000 yards of fabric each week by operating three shifts of employees around the clock. CT Page 11271
Normally, Priority receives its customers' unfinished raw fabrics, called "greige goods," in either rolls or bales. It warehouses these goods until the customer directs, by means of a "dye order," how they are to be finished. In dying and finishing the fabric, it transforms its customers greige goods into "finished goods."
The first step in processing greige goods is to flat fold and scour them to remove seizing and other impurities. Then the goods are dyed, a finish applied, and dried. The fabric is then rolled into tubes and packed in cardboard cartons. A "packing memo" is placed on the carton identifying the customer and contents of the carton, and the carton is usually held by Priority, at its warehouse at 168 Stevens Street in Fall River, Massachusetts, until the customer instructs delivery.
In the course of its business, in addition to dye orders and packing memos, Priority generates several other types of documents. "Travel tickets" identify each roll of greige goods by customer, lot, color, batch and yardage as it progresses through the plant. They are used to generate packing memos and not routinely retained by the company. "Production sheets" identify the employee operating a particular machine and the number of yards processed by the machine. They were routinely retained from October 1, 1993 in each of Priority's processing departments. Both travel tickets and production sheets are tucked into rolls, often lost and, also, often inaccurately filled out because Priority factory workers are Portuguese immigrants with little command of English. Priority kept no retrieval system for such documents.
At the end of 1992 Priority solicited all-risk commercial insurance from various companies through various insurance brokers. One of these was James Sequeira of Starkweather 
Shepley, Inc. David Smith, Vice President of Priority and the officer in charge of insurance, insisted that personal property of Priority's customers be covered on a primary basis. Mr. Sequeira testified he understood that requirement. Because Starkweather Shepley were authorized to sell Hartford Steam policies, Mr. Sequeira contacted Hartford Steam's account executive, Mr. Michael Whitefield, for a quote. Hartford Steam, then seeking to expand its base of business from boiler and machine coverage to all-risk property and casualty coverage, was aggressively marketing its new commercial policy called "Unitech." In fact, its account executives were paid a bonus of CT Page 11272 $1,000 for each Unitech policy sold. Mr. Sequeira told Mr. Whitefield that Priority wanted primary coverage for Priority's customers. Mr. Whitefield had been informed Priority had such coverage on its then existing policy and assumed Priority would want the same coverage from Hartford Steam. Whitefield also knew Priority held its customers' goods for a period of time and understood coverage was to include those goods.
His quote of the summary of terms and conditions of the Unitech policy stated "Property of others — included." The binder issued by Starkweather Shepley and approved by Whitefield, provided, as to property at Priority's warehouse at 160 Stevens Street, Fall River, Massachusetts, "Personal Property — all risks — amount $7,390,836: Property of others — all risks — amount $1,500,000."
On March 22, 1993 Hartford issued to Priority Unitech policy No. UNI-BN-8425600-01. Among its provisions were:
I. Insuring Agreement
C. Property Insured.
 This policy covers real and personal property, including improvements and betterments, owned, operated or controlled by the Insured and for which the Insured is legally liable, unless otherwise excluded at locations described in the Declarations.
P. Other Insurance.
 The Company shall not be liable for loss under this Policy if at the time of loss there is any other insurance which would attach if this insurance had not been effected, except that this insurance shall apply only as excess and in no event as contributory insurance and then only after all other insurance has been exhausted.
Since Hartford Steam's underwriting department did not inform Whitefield of any changes from the binder, he assumed the Policy followed the binder. After the Policy was issued, Sequeira inquired of Whitefield whether Priority's customers' goods were covered and Whitefield assured him they were. Certainly Whitefield never informed Sequeira that the "other insurance" clause in the Policy changed the coverage from primary to excess. CT Page 11273
Whitefield admitted he had not been trained in the Unitech policy was not thoroughly familiar with its provisions, and any confusion as to coverage was due to his own ignorance.
The court finds from all evidence that Priority wanted insurance that covered its customers' goods on a primary basis because those were the main goods in its warehouse for which it was responsible, and, further, it wanted to protect the lien it had for its improvements to the goods. Priority asked Sequeira for such coverage and Sequeira negotiated with Whitefield for that coverage. Whitefield believed that the Unitech provided that protection and led Sequeira to believe so.
In February, 1993 Priority suffered water damage to greige goods of its customers and through Starkweather and Shepley, made a claim for $65,573 under the Policy for reimbursement of the cost of the extra work to make the goods ready for processing. Hartford Steam's claim manager, Mr. Timothy Begley, wrote to Starkweather Shepley on March 18, 1993, stating "We have completed our investigation into the difficulty reported by you and find that we have liability within the terms and conditions of the policy."
Later, Begley learned that in a prior claim by Priority for damage to its customers goods, another insurance company had shifted the loss to the insurance carriers of Priority's customers. Begley reported to his superiors that by reason of this "fortunate break we [Hartford Steam] may have stumbled upon," Hartford Steam should take the position it was not primarily liable under the Policy. However, Starkweather and Shepley were an important source of business to Hartford Steam and in order to accommodate the agents, Hartford Steam settled Priority's $62,573 claim for $35,000. Hartford Steam admits it never directly notified Priority of the reason for paying the claim, and Starkweather Shepley, embarrassed by confusion over the coverage and concerned about its own potential liability, also did not inform Priority.
On the night of October 19, 1993, a fire occurred at Priority's warehouse at 168 Stevens Street. The fire department responded to the alarm and poured water into the first floor. The sprinkler system also went off. Smoke and soot filled both floors of the warehouse. Fire burned some greige goods, water from the firemen's hoses and the sprinkler system damaged more greige CT Page 11274 goods, and smoke and soot damaged greige and finished goods and the boxes and tubes that packaged them.
Priority reported the fire to Sequeira of Starkweather 
Shepley who promptly notified Hartford Steam. On October 20, 1993 a meeting convened at Priority's plant with the following present: Michael Rodriguez, Priority's executive vice president; Sequeira and Peter Gibbs of Starkweather Shepley; Bernard Grosky, a public adjuster hired by Priority; Timothy Begley, Hartford Steam's claims adjuster, and Francis Puopola, Hartford Steam's salvor. Rodriguez stated that because the fire, water, smoke and soot had caused extensive damage to fabric in the warehouse, he had to reprocess wet and smoked greige goods, and wash and air out finished goods. Begley first took the position the goods should not be touched until customers' insurance companies were notified. Rodriguez said that if he told the customers, they wouldn't pay for work previously done and Priority would go out of business. Begley said, "I didn't care." Heated words exchanged between Rodriguez and Begley. Begley was not interested in the details of reprocessing the goods, but he and Puopola said that Priority should document the extra work. However, neither of them specified the type of documentation they wanted. Begley was more concerned with issues of coverage: whether the fire was deliberately set by Priority and whether Priority's customers' insurance would be responsible for some of the loss.
A few days later, Grosky's assistant, Mark Mendes and Puopola's assistant, Steven Tessler, worked together to check an inventory of all the goods in the warehouse at the time of the fire and found it accurate. Mendes testified they were not to determine the extent of the damage, but in making the inventories of greige and finished goods, he noted burned and wet greige goods and smelled smoke on the furnished goods.
A second meeting was held at Priority on November 8, 1993 at which the key people from both Priority and Hartford Steam were present. By then Grosky had hired certified public accountant, B. Burton Schneider to assist in preparing the proof of loss and Priority had also retained accountant S. Harry Siperstein to assist in compiling yardage figures for goods reprocessed. Hartford Steam had hired MDD, which had its accountant Mr. Rubenstein, to review Priority's claim. These accountants also attended the meeting. CT Page 11275
Rodriguez stated that approximately 2,000,000 yards of finished goods and 1,000,000 yards of greige goods were damaged by the fire and would need some kind of reprocessing. Greige good would have to be rewashed twice; finished goods would have to be unpacked, aired out and repacked in new cartons and boxes. Hartford Steam people insisted the Policy provided only excess coverage and said they were still investigating the possibility of arson. They again requested in house records to support the cost of rehandling but did not specify, any particular type of documentation.
Following the meeting, Rodriguez gave representatives of Hartford Steam a tour of the plant, explaining the steps of restoring damaged goods and pointing out greige goods being reprocessed and finished goods being aired out.
After the fire and continuing for many months, Rodriguez, based on his many years of experience, decided the manner of reprocessing the damaged goods. Rodriguez inspected burned greige goods and determined they could not be refinished.
Wet greige goods went to the lay-out department, headed by Gilbert Paiva, where they were quickly reprocessed to prevent mold, mildew and water stains. Paiva kept a list of the wet greige goods restored in his department by customer, type of fabric and yardage. (Exhibit 20). The yardage totaled 43,895 yards.
Smoke-damaged greige goods also went to the lay-out department and were reprocessed as orders were received from customers. They were given a normal scour and when a smell test revealed smoke odor had not been removed, they were given a second scour. Production sheets were filled out for this extra work. From the production sheets and dye orders Paiva testified he prepared summary sheets on a daily basis. The summaries had all the information on production sheets and more, recording every roll number individually. The summaries were given to Siperstein to be entered in the computer from which spread sheets were derived. Production sheets were sent to Priority's main office but not retained. The yardage on these summaries (Exhibit 21) totaled 554,533 yards.
Smoke-damaged finished goods went to inspection and tubing department, supervised by Aries Oliviera. He testified to observing after the fire a lot of smoke and soot in the area CT Page 11276 where finished goods were stored. When these goods came to his department, cases were opened, the goods aired out, repacked on new rolls and in new cartons. The old boxes, smelling of smoke were thrown away. Oliviera had travel tickets and production sheets filled out for this work and affixed red stickers on the travel tickets marked "fire damage". The new packing memo on the boxes indicated contents had been reprocessed. From the travel tickets and new packing memos, he prepared summary sheets, signed by him on a daily basis as the work was done. The sheets were turned in to Mr. Burdick for entering into the computer. The travel tickets were kept in his department for five or six months and then discarded.
The number of yards of finished goods on summary sheets based on travel tickets and signed by Oliviera totaled 950,137.(Ex. 22). Summary sheets for rehandled finished goods were also prepared by Patrick Brennan, Priority data processing manager, based on old and new packing memos. The yardage from these sheets totaled 1,158,038 (Ex. 33).
Burton Schneider, the certified public accountant working with Bernard Grosky, Priority's public adjuster, calculated the proof of loss as follows: Siperstein provided the number of yards of goods reprocessed or rehandled on computer discs and printouts. Schneider determined the average per yard cost for Priority's departments involved. Consideration was not given to the cost of the individual work done on the fabric but the average cost of the department. Average costs were obtained from company records. Schneider checked them against a Peat Marwick audit of 1992 and added a factor of 13.5% over the 1992 costs. However, whereas Peat Marwick had used average overall costs per department, Schneider broke down average costs for labor, materials and overhead for each department. He assumed the minimum steps of re-processing were taken. For example, even though some finished goods were rewashed, he only considered cost of airing out and repacking. He determined that the company's allocation of cost per department was reasonable. In making his analysis and calculations, he stated he followed standard accounting practice and procedures.
Based on Schneider's calculation, Grosky submitted to Hartford Steam on March 24, 1994 Priority's proof of loss in the amount of $818,538, representing the cost of reprocessing 
rehandling fabrics damaged in the fire. At the time it was submitted 45% of the work had been done and the total claim was CT Page 11277 an extrapolation of work yet to be done.
On April 21, 1994, Hartford Steam rejected the proof of loss for the following reasons: (1) it was not "in sufficient detail, nor at all clear as to how loss dollars were determined." (2) requested financial information about Priority had not been provided so Hartford Steam could not complete its investigation of possible arson, and (3) the Policy coverage was excess over all other insurance.
Subsequently, Priority did provide additional financial information of its company, but Hartford Steam has never to the date of trial decided the arson issue. Although the Policy requires Hartford Steam promptly to admit or deny liability and Hartford Steam has a practice to do so within 30 days, Hartford Steam has never to the date of trial done so. Hartford Steam has never paid Priority on the Policy for the fire loss sustained.
 I. Breach of Contract Count
The initial issue to be decided under the Plaintiff's count alleging breach of contract is the matter of coverage. Section I.C of the Policy states:
 "This Policy covers real and personal property, including improvements and betterments, owned, operated or controlled by the insured and for which the insured is legally liable, unless otherwise excluded, at locations described in the Declarations" (italics added).
There is no dispute between the parties that the Policy covers Priority's own personal property. This property consisted of Plaintiff's finished goods, smoke damaged by the fire. The major dispute is whether or not the Policy covers, on a primary basis, the property of Priority's customers.
 A.
The interpretation of an insurance policy presents a question of law for the trial judge. Cody v. Conn. Gen. Life Ins. Co.,439 N.E.2d 234, 237 (Mass. 1982). The policy is to be construed "according to the fair and reasonable meaning of the words in which the agreement of the parties is expressed." MacArthur v.Massachusetts Hospital Services, 180 N.E.2d 449 (Mass. 1962). CT Page 11278
The Policy states two criteria for coverage of personal property. The first is property "owned" or "controlled" by Priority. The second is property for which Priority is "legally liable".
 1.
The property of Priority's customers was held by Priority as a bailee. A bailment arises when there is "the delivery of personal property by one person to another in trust for a specific purpose, with a contract, express or implied, that the trust shall be faithfully executed and the property retained or duly accounted for when the special purpose is accomplished, or kept until the bailor reclaims it." Little Brown Co. v.American Paper Recycling, 824 F. Sup. 11 (D. Mass. 1991).
This occurs typically when unfinished goods are delivered to a manufacturer for their conversion into finished goods, such as logs into boards, rags into paper, grapes into wine, and particularly in this case, greige goods into dyed and patterned fabrics. 8A Am.Jur.2d, Bailment § 21, at p. 483-484 (1997). In fact, the Appeals Court of Massachusetts specifically held that Priority was the bailee of the greige goods supplied by its customers. Priority Finishing Corp. v. LAL Constr. Co.,667 N.E.2d 290, 292 (Mass.App.Ct. 1996).
As a bailee, Priority "controlled" the goods of its customers entrusted to it. As stated in 8A Am.Jur.2d Bailment § 169 at p. 616 (1997) "[O]rdinarily, such exclusive possession and control of the bailed property is a characteristic, if not a requisite, of bailment. . ." In Knowles v. Gilchrist,289 N.E.2d 879, 884 (Mass. 1972), the Massachusetts Supreme Judicial Court justified shifting the burden of proving due care of damaged goods onto the bailee precisely because the bailee had exclusive control of the goods and was in the best position to explain what happened to the goods.
As a bailee, Priority also "owned" the goods placed with it. Under Massachusetts law, the word "owner" is "of flexible meaning . . . It varies from an absolute proprietary to a mere possessory right." Animal Rescue League of Boston v. Bourne'sAssessors, 37 N.E.2d 1019, 1022 (Mass. 1941). The word is not a technical term. "It is not confined to the person who has the absolute right to a chattel, but also applies to a person who has the possession and control of it." Coyle v. Swanson, CT Page 11279185 N.E.2d 741, 743 (Mass. 1962). In Coyle the Massachusetts Supreme Judicial Court of Massachusetts specifically noted that the word owner embraced bailee.
Moreover, Mass.Gen.L. c. 255 § 31A (the Processor's Lien statute) gives Priority a lien against goods in its possession for the unpaid balance owed for processing its customers' goods. As stated in 51 A.Jur.2d, Lien § 21 at p. 159, 160 (1980), "One in possession of property under a lien is the owner of the property as against all the world and even against the actual owner, until his claim is paid. . ."
Also, Priority owned the "improvements and betterments" it added to its customers goods by dyeing and finishing them. Here it seeks under the Policy the cost of restoring those improvements to its customers' finished goods.
Thus, this court concludes that Priority "owned" and or "controlled" the personal property of its customers, within the meaning of the Policy, and the first criteria of coverage was met.
 2.
The second criteria is property for which Priority is "legally liable."
Under Massachusetts law, a bailee is not legally liable for goods of the bailor damaged while in the possession of the bailee if the bailee shows he exercised due care in the custody of those goods. Knowles v. Gilchrist Co., 289 N.E.2d 879, 885 (Mass. 1972). Relying on this doctrine and an admission by Priority that it exercised due care in the custody of its customers' goods, the defendant argues that the Policy does not cover damage to Priority's customers' goods because Priority was not legally liable.
The court in Folder Coffee Co., Inc. v. Great AmericanInsurance Co., 333 F. Sup. 1272 (W.D. Mo. 1971), addressed a similar issue. That case involved substantially the same policy provision covering personal property usual to the conduct of the insured's business "or similar property of others held by the insured for which the insured is liable." Id., 1274.
The court explained that "[i]n cases like that at bar . . . CT Page 11280 the courts have almost uniformly held that if, from the contract construed in its entirety, the fair interpretation and construction of the insurance contract is that it was intended primarily to cover the property held by the insured, then `liable,' as used within the policy, does not refer to any fixed legal liability of the insured to respond in damages, but should be construed more broadly to mean `responsible.' This view is well developed in the leading cases of Penn v. Commercial UnionFire Ins. Co., 233 Miss. 178, 101 So.2d 535, 67 A.L.R.2d 1238, and United States v. Globe Rutgers Fire Ins. Co., 104 F. Sup. 632
[(N.D. Tex., 1952)], aff'd, 202 F.2d 696 [(5th Cir. 1953)].Penn v. Commercial Union Fire Ins. Co., supra, expresses the prevailing rule precisely that the insurance covers property in possession of the bailee for which he is responsible, and does not cover the legal liability of the bailee to respond in damages." Folger Coffee Co., Inc. v. Great American InsuranceCo., supra, 333 F. Sup. 1274.[1]
In United States v. Globe Rutgers Fire Ins. Co., supra,104 F. Sup. 634, the court explained the difference between cases involving a policy that insures the property and those cases that involve a policy that insures only the liability of the insuredwith respect to the property. "The contention of the defendants is that the plaintiff cannot recover under the present policies without showing that the insured is legally liable for the fire loss of the cotton seed. That view is quite arguable. The pertinent provision of the policies has been quoted in full above and the central phrase thereof reads `provided the insured is legally liable therefor.' . . . If the policy provision in fact read `on the liability' of the insured then to be sure it only could mean liability for fire loss of the property, and the plaintiff would fail in the suit. . . The present policies, however, plainly purport to insure property . . . and the reasonable construction of the insurance contract is that the central phrase of the policy provision means liability of the insured already present and not contingent liability ushered in by a fortuitous fire." Id. In affirming the judgment of the District Court, the Circuit Court of Appeals held that "the trial Court properly gave great weight to the fact that the entire tenor and effect of the contracts was insurance against property loss by fire and not insurance only against legal liability of the named insured for the fire loss. The policies provided property insurance, — not indemnity or liability insurance." United States v. Globe Rutgers Fire Ins. Co.,supra, 202 F.2d 697. CT Page 11281
The defendant relies on the old case of Washburn-Crosby Co.v. Home Insurance Co., 85 N.E. 592 (Mass. 1908), to support its argument that the policy in the present case only covers Priority for its legal liability for damage to the property of others. That case, however, is distinguishable from the present one. InWashburn, the owner of property held by a railroad company as bailee sought to recover against the insurance company of the railroad for the loss suffered by the owner on the ground that the owner's interest was insured under the policy. The Massachusetts Supreme Court denied recovery on the ground that the interest of a third person in the property described in a policy is not covered thereby in the absence of a provision that the policy shall inure to the "benefit of whom it may concern."Id. The court construed the policy as one of indemnity, covering Boston Maine Railroad for its legal liability for damage to property of others. The policy in Washburn, however, was different from the one in the present case because it provided that it attached "upon the property, interests and legalliability of the Boston Maine Railroad." (Italics added.)
The defendant's reliance on the cases of Millers' Mutual FireInsurance Association v. Warroad Potato Growers Association,94 F.2d 741 (8th Cir. 1938), In Re Podolsky, 115 F.2d 965 (3rd Cir. 1940), and Orient Insurance Co. v. Skellet Co., 28 F.2d 968 (8th Cir. 1928), are equally unavailing. Those cases either applied the minority view recognized in Minnesota, or involved contracts of insurance which specifically covered only the legal liability of the insured to respond in damages. Thus in Millers' MutualFire Insurance Association v. Warroad Potato Growers Association,supra, 94 F.2d 742 the policy insured potatoes handled or used by the insured, its own or held by it in trust or on storage, `if incase of loss the insured is legally liable therefor'"; In RePodolsky, supra, 115 F.2d 967 policy insured the plaintiff "on his interest in and on his legal liability for property of others which he held in his possession." (Italics added).
The distinction between cases holding that the contract insures property and those holding that the contract is one of indemnity, insuring only the legal liability of the insured to respond in damages, is based on a "rule of construction that if the primary intention of the policy is to insure property, then the property of others will be included, but that when the intent is only to insure against liability and not to insure property, then only the legal liability of the insured with respect to the CT Page 11282 property will be covered." Annot., Fire Policy on Contents or the Like as Covering Property of Insured's Customers or Bailors, 67 A.L.R.2nd, [A.L.R.2d], 1241, 1244-45 (1959).
Accordingly, the court find that the language of the Policy in the present case unambiguously provides insurance on property, and does not cover the legal liability of Priority to respond in damages. The phrase "for which the insured is legally liable" refers to property in the possession of Priority as bailee, and for which Priority is responsible.
 B.
The defendant argues that the Policy does not provide coverage for the damaged goods because Priority's customers assumed the risk of loss for damage to their finished goods that were stored with Priority. Specifically, the defendant argues that legal liability for damage to the finished goods was disclaimed by Priority in a packing slip provided its customers that stated that: "Goods are Held at Customer's Risk." Thus, the defendant argues that because Priority is not legally liable for damage to the finished goods of its customers, Priority is not covered under the policy for damage to these goods.
This court has already decided that the term legal liability as used in the Policy does not refer to any fixed liability of Priority to respond in damages, but rather to property of others in the possession of Priority for which Priority, as bailee, was responsible. Therefore, the defendant's argument that the Policy does not provide coverage because Priority was not legally liable for the finished goods is without merit. The court will nevertheless address the issue of whether the statement on the packing slip was a valid disclaimer of Priority's liability for damage to its customers' finished goods.
A bailee is required to exercise reasonable care under the circumstances and "[u]nder Massachusetts law, the liability arising from breach of this duty may be limited by contract."Marantz Co., Inc. v. Claredon Industries, Inc., 670 F. Sup. 1068,1072 (D. Mass. 1987). Massachusetts courts have also held that "[w]here what is given to a plaintiff purports on its face to set forth the terms of a contract, the plaintiff, whether he reads it or not, by accepting it assents to its terms, and is bound by any limitation of liability therein contained, in the absence of fraud." D'Aloisio v. Morton's Inc., 172 N.E.2d 819, 821 (Mass. CT Page 11283 1961). Under Massachusetts law, however, where "what is received is apparently a means of identification of the property bailed, rather than a complete contract, the bailor is not bound by a limitation upon the liability of the bailee unless it is actually known to the bailor." Kergald v. Armstrong Transfer Exp. Co.,113 N.E.2d 53, 54 (Mass. 1953).
Moreover, "[t]he policy of Massachusetts is to allow the parties, if they so choose, to exclude liability for damages arising from negligence." Marantz Co., Inc. v. ClaredonIndustries, Inc., supra, 670 F. Sup. 1072. "[T]he law[, however,] does not favor attempts to avoid liability for one's own negligence. . . Attempts to enforce such limitations can succeed only when it is absolutely clear that such was the understanding of the parties. In other words, it must be plainly and precisely provided that limitation of liability extends to negligence or other fault of the party attempting to shed his ordinary responsibility." (Citations omitted; internal quotation marks omitted.) E.F. Hutton Group, Inc. v. United States PostalService, 723 F. Sup. 951, 965 (S.D. N.Y. 1989).
In Magliozzi v. P T Container Service Co., Inc.,614 N.E.2d 690, 691 (Mass.App.Ct. 1993), the issue before the court was whether an indemnification provision printed on the back of a trash pickup ticket provided the lessee with sufficient notice of the lessor's offer to modify an existing contract between the parties. The court explained that "[a]n inference of assent is not warranted . . . where the subsequent writing (1) is used for other purposes . . . (2) does not purport to be a contract and is not contractual in form: and (3) gives no notice whatsoever of proposed additional terms which are not visible on the face of the writing. In these situations, the `party without knowledge or reason to know that the . . . [pickup ticket] purports to be a contract is then not bound by terms printed on the [ticket].'"Restatement (Second) of Contracts § 211 comment d and illustration 3 (1979)." Id., 692. See also Griffin v. NationwideMoving Storage Co., 446 A.2d 799 (Conn. 1982) (holding that "[t]he assent of both parties is necessary to the special provisions limiting liability of the bailee").
The present case is analogous to Magliozzi and Kergald. In the present case, the packing slips do not constitute a complete contract between Priority and its customers, but rather they serve as a means of identification of the property bailed. Moreover, there is no evidence that Priority's customers assented CT Page 11284 to the liability disclaimer and assent cannot be inferred because the packing slips were used for other purposes, namely identification of bailed goods, and the slips do not purport to be contracts or contractual in form. D'Aloisio v. Morton's Inc.,supra, 172 N.E.2d 821, relied upon by the defendant, is distinguishable from the present case. In that case, the court concluded that the plaintiff was bound by the terms of the "storage receipt and contract" because the receipt was a complete contract rather than a means of identification.
Accordingly, this court concludes that the packing slips did not effectively disclaim the liability of Priority with respect to the finished goods.
 C.
In addition to Policy language providing coverage, the doctrine of reasonable expectations mandates a finding of primary coverage under the Policy for the goods of others.
The doctrine of reasonable expectations has been conceptualized by Professor Robert E. Keeton as follows: "The objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though a painstaking study of the policy provisions would have negated those expectations." Insurance Law Rights atVariance with Policy Provisions, 83 Harv. L. Rev. 961, 967 (1970). This doctrine incorporates the principle that "policy language will be construed as laymen would understand it and not according to the interpretation of sophisticated underwriters." Keeton, supra, Insurance Law, 967.
The doctrine is also premised upon the notion that "insurers ought not to be allowed to use qualifications and exceptions from coverage that are inconsistent with the reasonable expectations of a policyholder having an ordinary degree of familiarity, with the type of coverage involved. This ought not to be allowed even though the insurer's form is very explicit and unambiguous, because insurers know that ordinarily policyholders will not in fact read their policies. Policy forms are long and complicated and cannot be fully understood without detailed study; few policyholders ever read their policies as carefully as would be required for moderately detailed understanding." Keeton, supra,Insurance Law, 968. CT Page 11285
In Trustees of Tufts University v. Commercial Union InsuranceCo., supra, 616 N.E.2d 68, the issue before the court was whether, pursuant to a policy of insurance, liability, insurers were under a duty to defend the insured. In construing the policy language, the Massachusetts Supreme Judicial Court held that "it is also appropriate to consider what an objectively reasonable insured, reading the relevant policy language, would expect to be covered." Id., 72. The court, however, did not apply the doctrine to the facts of the case. Hartford Steam, therefore, argues that Massachusetts has not adopted the doctrine. Several district court decisions applying Massachusetts law, as well as recent opinions of both the Massachusetts Supreme Judicial Court and Appeals Court, however, indicate that Massachusetts decisions are consistent with and embrace the doctrine.
For example, in Hakim v. Massachusetts Insurers' InsolvencyFund, 675 N.E.2d 1161 (Mass. 1997), the question before the Massachusetts Supreme Judicial Court involved the interpretation of an insurance contract. In construing the contract, the court held that "[i]t is also appropriate that we consider `what an objectively reasonable insured, reading the relevant policy language, would expect to be covered.' Trustees of Tufts Univ.,supra, at 849, 616 N.E.2d 68, quoting Hazen Paper Co., supra, at 700, 555 N.E.2d 576. We conclude that a reasonable policyholder would expect coverage of some and possibly all of the disputed cleanup costs in the circumstances of this case." Id., 1165. InHazen Paper Co. v. United States Fidelity Guaranty Co.,555 N.E.2d 576, 583 (Mass. 1990), the Massachusetts Supreme Judicial Court held similarly and in applying the doctrine of reasonable expectations to the facts of the case, the court concluded that "[o]n this approach, a reasonable policyholder reading the language would fairly expect that the policy covered amounts he must spend to correct pollution damage for which the law holds him responsible."
The doctrine was clearly applied by the Massachusetts Supreme Judicial Court in Western Alliance Insurance Co. v. Gill,686 N.E.2d 997 (Mass. 1997). In that case, the court explained that in previous cases, "[w]e [have] applied the established principle that, [w]hen construing language in an insurance policy, we consider what an objectively reasonable insured, reading the relevant policy language, would expect to be covered. . ." (Citations omitted, internal quotation marks omitted.) Id., 998. The court applied the doctrine to the facts of the case and held that [t]he insureds purchased the general liability policy to CT Page 11286 protect against potential premises and operations hazards that could arise while conducting a restaurant business. A reasonable insured would not expect a pollution exclusion to abrogate this coverage." Id., 1000-01. See also Rubenstein v. Royal InsuranceCompany of America, 694 N.E.2d 381, 387 (Mass. Appeals Ct. 1998) (holding that "the reasonable expectations of the insured can be taken into account in construing the insurance contract").
Moreover, in Preferred Mutual Insurance Co. v. TravelersCompanies, 955 F. Sup. 9, 13 (D. Mass.). aff'd, 127 F.3d 136 (1st Cir. 1997), the court held that Massachusetts recognizes that it is appropriate to apply the doctrine of reasonable expectations when construing an insurance contract. See also Dryden Oil Co. ofNew England, Inc. v. Travelers Indemnity Co., 91 F.3d 278, 282
(1st Cir. 1996) (citing the Trustees of Tufts University cases and holding that "[w]e interpret the relevant policy language with a view to whether `an objectively reasonable insured . . . would expect to be covered'").
Accordingly, this court concludes that pursuant to Massachusetts law, this court may apply the doctrine of reasonable expectations and consider whether an objectively reasonable insured would expect to be covered under the relevant policy language. As the court in Preferred Mutual Insurance Co.v. Travelers Companies, supra, 955 F. Sup. 13, held, however, "a plaintiff cannot prevail by simply claiming the expectation coverage. . . Without some factual basis supporting the expectation, such as evidence of the insurer's representations, the doctrine of reasonable expectations is of no avail."
Therefore, in applying the doctrine, this court must take into account the following factors. First, the doctrine is applied from the standpoint of an objectively reasonable insured, subjective expectations of Priority in the present case being irrelevant. Hazen Paper Co. v. United States Fidelity GuarantyCo., supra, 555 N.E.2d 583. The doctrine also applies irrespective of whether the contract language itself is ambiguous. See Davenport Peters Co. v. Royal Globe Insurance Co.,490 F. Sup. 286, 290-91 (D. Mass. 1980) (applying Massachusetts law and holding that a conclusion that the contract language is unambiguous does not end an inquiry into the applicability of the doctrine of reasonable expectations); Bond Bros., Inc. v.Robinson, 471 N.E.2d 1332, 1335 (Mass. 1984) (holding that "[i]n any analysis of the scope of the coverage of an insurance policy, it may be appropriate to consider what a policyholder reasonably CT Page 11287 should expect his coverage to be in the circumstances").
Additionally, it is the reasonable expectations of theinsured, and not the insurer, that must be considered by the court. Hakim v. Massachusetts Insurers' Insolvency Fund, supra, 675 N.E.2d 1165; Vargas v. Hudson County Board of Elections,949 F.2d 665, 672 (3rd Cir. 1991). Finally, this court notes that an application of the doctrine may result in a construction of the contract that is precisely in contradiction to the terms of the policy. See Keeton, supra, Insurance Law, 974 (explaining that "[i]f the enforcement of a policy provision would defeat the reasonable expectations of the great majority of policyholders to whose claims it is relevant, it will not be enforced even against those who know of its restrictive terms").
In determining what an objectively reasonable insured would expect to be covered, regard should be had to the type of risk that one in the business of the insured would be concerned about insuring against. Clearly, Priority being in the finishing business and engaged in processing and storing the goods of its customers, was primarily concerned with insuring those goods. It had very little goods of its own in process in its warehouse.
Moreover, no rational insured in Priority's business would have interpreted the language in the Policy about property as to which Priority was "legally liable" to mean it had coverage if it were negligent in handling its customers' good, but had no coverage if it were not negligent. Such an insured would be expected to buy insurance to cover property in its possession, whether or not it were negligent.
Furthermore, in determining the reasonable expectations of an insured the courts have considered "methods and practice of marketing" of the insurer, Davenport Peters Co. v. Royal GlobeInsurance Co., 490 F. Sup. 286, 292 (D. Mass. 1980); and the insurer's representations. Preferred Mutual Insurance Co. v.Travelers Companies, 955 F. Sup. 13 (1997).
Here, Priority's officer, Mr. Smith sought from several insurance brokers coverage of its customer goods on a primary basis similar to what he believed the coverage it had with Wausau Insurance Company, its existing insurer. He specifically required it of Mr. Sequeira of Starkweather Shepley, licensed agents of Hartford Steam. Mr. Sequeira told Mr. Whitefield, Hartford Steam's salesman on several occasions that Priority had to have CT Page 11288 primary coverage for its customers' goods.
Mr. Whitefield testified that when he bid for the Priority account, he thought he was matching Priority's existing policy with Wausau that he understood provided primary coverage. When the Policy was issued by Hartford Steam, Mr. Sequeira inquired about primary coverage and Mr. Whitefield assured him the policy did provide it. Mr. Sequeira passed this information on to Mr. Smith.
The policy issued was a Unitech policy, a new product offered by Hartford Steam and one it was pressing its salesmen to sell as it entered the field of insuring companies such as Priority. In fact, it paid Mr. Whitefield a bonus to encourage sale of that policy without training him about it. Mr. Whitefield admitted "his ignorance" as to the coverage under the Unitech policy and the confusion on that score was because he sold the policy to Priority "without knowing whether the coverage provided by the Unitech policy for the goods of others was primary or excess in nature."
Thus, because Priority sought primary coverage for its customer's goods on its premises, through its independent agent informed Hartford Steam's salesmen of that fact, that agent was assured by Hartford Steam's salesmen that the Unitech policy provided that coverage, Priority had "objectively reasonable expectations," based upon Hartford Steam's representations and "methods and practice of marketing", Davenport Peters Co. v.Royal Globe Inc., supra at 292, that the coverage was that which it sought.
 D.
Hartford Steam contends that even if the policy covers Priority's loss, Priority cannot recover because it breached the provision in the policy requiring cooperation. That provision states:
 The insured shall cooperate with the company, and upon the Company's request and expense, shall attend hearings and trials and shall assist in effecting settlements, servicing and giving evidence, obtaining the attendance of witnesses and in conducting suits."
Specifically Hartford Steam argues that Priority failed to CT Page 11289 cooperate by (1) refusing to allow Hartford Steam to determine whether or not Priority's customers had insurance on their goods, and (2) neglecting to provide records to document its loss.
A "breach of the duty to cooperate on the part of the insured must be `substantial and material' before it permits an insurer to disclaim liability." Darcy v. Hartford Insurance Co.,554 N.E.2d 28, 32 (Mass. 1990). Moreover "actual prejudice to an insurer's interest due to lack of an insured's cooperation must be demonstrated before a denial of coverage will be permitted."Id. at 33.
 1.
The policy provides at Section IV, Part P:
 The Company shall not be liable for loss under this policy if at the time of loss there is any other insurance which would attach if this insurance had not been effected, except this insurance shall apply only as excess and in no event as contributory insurance, and then only after all other insurance has been exhausted.
After the fire Hartford Steam requested Priority to notify its customers of the fire and to place the customers' insurance carriers on notice of the loss. Priority refused on the ground that if it gave that notice, its customers would not pay their outstanding bills owed Priority. Hartford Steam claims this refusal deprived Hartford Steam of its right to assert that other insurance covered the damage caused by the fire. As a result Hartford Steam was prejudiced and Priority, having breached its obligation under the policy to cooperate, cannot recover.
This court notes that Hartford Steam does not assert the "other insurance" clause as a defense and as a basis for claiming its coverage is only excess. Rather, it asserts the clause as a basis for claiming Priority's lack of cooperation. Moreover, nothing prevented Hartford Steam from obtaining information about Priority's customer's insurance through discovery in this case. That is a strong indication that Hartford Steam has known all along the "other insurance" clause is not in and of itself a valid defense.
Leaving aside whether or not the cooperation provision of the CT Page 11290 policy requires Priority to notify its customers' carriers of the fire, the "other insurance" provision affords Hartford Steam no remedy in this case.
A rule of construction is that "any provision with respect to other insurance or equivalent concepts which are of doubtful meaning will be construed most strongly against the insurer. . ." Couch on Insurance, 3d § 98.8 (1997).
Other insurance clauses refer to other insurance purchased by the insured itself and does not refer to other insurance purchased by anybody else. As stated in American Alliance Co v.Brady Transfer and Storage, 101 F.2d 144, 147 (8th Cir. 1939), "The term `other insurance must . . . be construed to apply to other insurance by the insured."
This is the Massachusetts rule. The Massachusetts Appellate Court states in McCormick v. Travelers Indemnity Co.,496 N.E.2d 174, 176 (Mass.App.Ct. 1986), "The `other insurance' clause of the defendant's policy limits the priorities provision to those situations where the damage is the result of a peril or peril included in the coverage of both the defendant's policy and anyother policy that the insured may have." (emphasis added).Automobile Ins. Co. v. Springfield Dyeing Co. (109 F.2d 533 (3d Cir. 1940) is precisely in point. In that case, the insurer issued a bailee's policy to Springfield Dyeing Company, a dyer and finisher of silk products, covering property of its customers while in possession of Springfield Dyeing Company. The policy contained an "other insurance" provisions worded almost exactly the same as in Hartford Steam Policy. When goods of one of Springfield Dyeing Company's customers were stolen, the insurer claimed its exposure was only in excess of that customer's insurance. The Circuit Court in affirming the District Court's decision for Springfield Dyeing Company, held, "We are of the opinion that the `other insurance' in suit referred only to other insurance taken out by the insured named in that policy. Accordingly, the Westchester policy in favor of Roxborough [the customer] is of no materiality to the question of the appellant's [insurer's] liability." (at p. 536)
Similarly, here the other insurance clause in the policy refers only to other insurance obtained by Priority and so does not implicate whatever insurance its customers may have.
"Moreover, other insurance claims exclude coverage only where CT Page 11291 two or more policies cover the same interest, in the sameproperty, against the same risks, and in favor of or for the benefit of the same person." American Insurance Co. v. FreeportCold Storage, Inc., 703 F. Sup. 1475, 1485 (D. Wyo. 1989) citing 6 J. Appleman and J. Appleman, Insurance Law and Practice, § 3909 (1980). See also Couch on Insurance 3d. § 981 (1997).
Here Priority purchased the Policy covering the property of the customers in its possession to protect is own interest in the value added to the goods by its labor and as holder of a lien, pursuant to Massachusetts Processor's Lien law. This was an interest distinct from its customers' ownership in that property.
It follows that even if Priority breached its obligation under the policy to cooperate by refusing to notify its customers' insurance carriers of the fire, it was not material and did not prejudice Hartford Steam because the other insurance clause of the policy did not refer to Priority customers's insurance.
 2.
Hartford Steam further asserts that Priority breached its obligation under the policy to cooperate by failing to provide certain source records to document its loss.
The policy contains the specific provision:
 The insured, as often as may be reasonably required shall produce for examination all books of account, bills, invoices and other vouchers at such reasonable times and place as may be designated by the Company and shall permit extracts and copies thereof to be made.
"The purpose of [a c]ooperation [c]lause is to enable the insurer to obtain all knowledge and facts concerning the cause of the fire and the loss involved while the information is fresh in order to protect itself from fraudulent and false claims." HudsonTire Mart, Inc. v. Aetna Casualty Surety Co., 518 F.2d 671, 674
(2nd Cir. 1975). See also Sarnafil Inc. v. Peerless InsuranceCo., 609 N.E.2d 1234, 1238 (Mass.App.Ct. 1993) (holding that notice and cooperation requirements "are designed to give the insurer the opportunity to protect its interests"). Under Massachusetts law, a "breach of the duty to cooperate on the part of the insured must be `substantial and material' before it CT Page 11292 permits an insurer to disclaim liability. Darcy v. HartfordInsurance Co., 554 N.E.2d 28, 32 (Mass. 1990). When an insurer seeks to disclaim coverage based on a violation of cooperation provision in an insurance contract, a showing of actual prejudice on the part of the insurer is required. Id., 33.
In Augat, Inc. v. Liberty Mutual Insurance Co.,571 N.E.2d 357, 360-61 (Mass. 1991), the Massachusetts Supreme Court explained that decisions requiring a showing of actual prejudice on the part of the insurer in order for an insurer to disclaim coverage for a violation of notice, consent-to-settlement and cooperation provisions "rejected the traditional, contractual approach to the interpretation of insurance policies, whereby breach of a policy provision would automatically relieve the insurer of liability. This traditional approach . . . fails to recognize the true nature of the relationship between insurance companies and their insureds. An insurance contract is not a negotiated agreement; rather its conditions are by and large dictated by the insurance company to the insured. The only aspect of the contract over which the insured can bargain is the monetary amount of coverage." (Citations omitted; internal quotation marks omitted.) The court further explained that "we [have therefore] held that the violation of a policy provision should bar coverage only where the breach frustrates the purpose underlying that provision. Notice, consent-to-settlement, and cooperation provisions share a common purpose, we ruled: to give the insurer the opportunity to protect its interests. . . Accordingly, we held that an insurer seeking to disclaim liability because of a breach of one of these provisions must demonstrate that the breach actually prejudiced the insurer's position." (Citations omitted.) Id., 361.
It should also be noted that "[t]he obligations under a cooperation clause are reciprocal. The insured must cooperate; but the insurer is under a duty to exercise diligence and good faith in bringing that about. The demand for cooperation by the insurer must not be unreasonable." Imperiali v. Pica,156 N.E.2d 44, 47 (Mass. 1959).
Insurers have typically prevailed on their defense of lack of cooperation when an insured was difficult to locate and communicate with, and refused to appear at trial. Morrison v.Lewis, 221 N.E.2d 401 (Mass. 1966); Polito v. Galluzo,149 N.E.2d 375, 377 (Mass. 1958). In Mello v. Hengham Mutual Fire InsuranceCo., 656 N.E.2d 1247 (Mass. 1995) the refusal of an insured to CT Page 11293 submit to the insurer's examination under oath was held to violate the obligation to cooperate, despite the insured's assertion of his Fifth Amendment rights because of a pending criminal charge.
While this court has found no Massachusetts cases dealing with the issue of when failure to provide certain documentation constitutes a breach of the cooperation clause, the generally recognized rule is that an insurer is entitled to require of the insured sufficient records to substantiate the validity of the loss. Couch on Insurance 2d (Rev) § 49A: 142. However, where a policy had a provision similar to the policy in this case, and insured's records were destroyed by fire, the insured met its obligation by providing substitute documents because substantial compliance is all that is necessary." Travelers Fire InsuranceCo. v. Frady, 180 F.2d 339, 341 (4th Cir. 1950).
Shortly after the fire, representatives of Priority and Hartford Steam took a physical inventory of all the damaged greige and finished goods in the warehouse where the fire occurred. Both representatives recognized that goods were damaged to some extent by fire, water and smoke. Each representative signed the inventory of the other.
At the meeting held by the officers of Priority and claims representatives of Hartford Steam after the fire, statements were made about Priority keeping records of the costs of restoring goods, but no specific documentation was mentioned. At those early meetings, Mr. Begley, Hartford Steam's claims adjuster showed little interest in documentation because from the start he questioned coverage based on his suspicion of arson, and the "other insurance" clause in the policy. Priority itself recognized it had to maintain sufficient records to validate its proof of loss.
Priority kept a record of its reprocessing of damaged goods as follows: All wet and smoked greige goods went to the lay-out department where they were washed twice and production sheets filled out. Each day from those production sheets, Gilbert Paiva, the supervisor of the department, prepared summaries of the number of yards worked on. Paiva observed the work done so he knew of the accuracy of the production sheets. He initialed the summaries and turned them in to Mr. Siperstein on a daily basis. He sent original production sheets to main office and kept a copy in his department for a year before he threw them out. CT Page 11294
Smoke damaged finished goods went to the inspection and tubing department. Cases were opened, aired out and fabric repacked. Travel tickets were made from old packing memos. Arias Olivera, supervisor of the department, affixed red stickers, marked "fire damage," to travel tickets. Production sheets were also prepared by his employees but he did not rely on them because they were often improperly filled out. Rather he used the travel tickets as the basis for preparing his summaries for rehandling works done in his department, signed the summaries and gave them to Mr. Burdick who entered them into the computer. After five or six months he threw away the travel tickets and red stickers. The summaries became the basic data Priority used to compute its proof of loss.
Hartford Steam contends that Priority's failure to provide the original travel tickets and production sheets constitutes a breach of the cooperation and documentation clauses of the Policy. The court finds this contention without merit.
Hartford Steam never requested Priority retain the travel tickets and production sheets and Priority's policy was to discard them after a time. Priority reasonably believed the summaries it made of the production sheets and travel tickets on a daily basis documented the work done. When Hartford Steam finally asked for the production sheets and travel tickets, they had been discarded. While they might have been helpful evidence of the reprocessing of the damaged fabrics, the summaries Priority made of those items on a daily basis were also competent evidence. They represented "substantial compliance" with Priority's obligation under the Policy.
Moreover, Hartford Steam inspected the premises after the fire, took an inventory of the damaged goods, has had the opportunity to examine Priority's employees, its independent insurance adjuster, all its officers and computer people and the accountant preparing the proof of loss. The courts find that, under all circumstances of this case, Hartford Steam has not shown it has been significantly prejudiced by Priority's failure to provide original travel tickets and production sheets. Thus, the court concludes Priority has not breached its obligation under the cooperation clause of the Policy.
 II. Breach of Covenant of Fair Dealing Count CT Page 11295
Priority alleges Hartford Steam breached its duty of good faith and fair dealing implied in every contract, Restatement ofthe Law of Contracts 2d § 205, by failing to pay Priority's claim when liability was reasonably clear.
Under Massachusetts law, an insured owes a common law duty of good faith and fair dealing to its insureds in the settlement of claims. Murach v. Mass. Bonding Insurance Co., 158 N.E.2d 338
(Mass. 1959). But for liability to attach "something more must be shown than [insurer] failing to make a settlement which a reasonably prudent person exercising due care `from the standpoint of the assured' would have made." Abrams FactoryMutual Liability Insurance Company (10 N.E.2d 82, 86 (Mass. 1937). There must be a showing of failure to investigate the facts of a claim, Murach v. Mass. Bonding Insurance Co., supra, p. 341; or favoring its own interest over that of the insured,Keeton, Liability Insurance Responsibility for Settlement, 67 Harvard Law Review, 1136, 1148; or "some malicious, fraudulent or otherwise similarly improper motivation," Spencer Press, Inc. v.Utica Mutual Insurance Co., 1 MASS. L. RPTR. 469, 476 (1994).
Here Hartford Steam refused to pay Priority under the Policy and chose to contest the claim for a number of reasons: (1) its suspicion of arson which was confirmed by an independent investigator, although Hartford Steam was never able to prove it even five years after the fire; (2) its contention that the "other insurance" clause of the Policy rendered the coverage excess, a contention this court finds invalid, but not unreasonable; (3) its insistence upon further documentation of Priority's costs of reprocessing the fabrics, a demand that was also not unreasonable.
The court further finds Hartford Steam made a reasonable attempt to investigate the claim, did not act in its own interest in conflict with that of Priority's, and did not act fraudulently or maliciously. Thus, the court concludes Priority failed to prove its count of breach of the covenant of good faith and fair dealing.
 III. Breach of Unfair Trade Practices Act Count
Priority also alleges Hartford Steam violated Massachusetts Unfair Trade Practice Act. General Law, c. 93A, § 2(a). That statute provides that "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or CT Page 11296 commerce are hereby declared to be unlawful." Section 9 of c. 93A provides that consumers may bring causes of action for violation of § 2(a), and Section II of c. 93A provides that commercial plaintiff may. The Massachusetts Act, like the Connecticut Unfair Trade Practices Act (Gen. Statutes §§ 42-110a, et seq.) does not define an unfair trade practices, but looks to federal law for guidance. Thus, when deciding whether or not a particular act or practice violates c. 93A, the court should consider whether the practices is (1) within the shadow of some common law, statutory, or other established concept of unfairness; (2) is immoral, unethical, oppressive or unscrupulous, (3) causes substantial injury, to consumers or other businessmen. Kerlinskyv. Fidelity Deposit Co. of Maryland, 690 F. Sup. 1112, 1117
(D. Mass. 1987); Kasmaier v. Wooten, 761 F.2d 46, 51 (1st Cir. 1985). This court finds Priority failed to establish any of these criteria.
Massachusetts also has a statute, Mass. Gen. L.c. 176 D, entitled "Unfair Methods of Competition and Unfair and Deceptive Acts and Practices in the Business of Insurance" which prohibits insurance companies from engaging in specific enumerated practices.
While for consumers violations of c. 176D constitute per se acts of unfair trade practices under c.93A § 2(a), for commercials plaintiff's such violations do not necessarily constitute acts of unfair trade practices under c. 93A § 2(a). Polaroid Corp. v. Travelers Indemnity Co., 610 N.E.2d 912,916 (Mass. 1993). Kiewit Const. Co. v. Westchester Fire Insurance Co., 878 F. Sup. 298 (D. Mass. 1995).
Priority asserts that Hartford Steam violated (1) c. 176D § 3(9)(e) by failing to affirm or deny coverage of Priority's claim within a reasonable time after the proof of loss statements had been completed and (2) c. 176D § 3(9)(f) by failing to effectuate a prompt, fair and equitable settlement of Priority's claim after liability had become reasonably clear. As to affirming or denying coverage, Hartford Steam denied Priority's proof of loss because it was not, in its opinion, adequately documented. As far as refusing to settle Priority's claim, Hartford Steam had at least colorable reasons for not doing so, as stated by this court above in denying Priority recovery on its count for breach of good faith and fair dealing.
Moreover, Priority cites no Massachusetts cases and this CT Page 11297 court finds none holding that even if Hartford Steam violated § c. 176 D § 3(9)(e) and (f) that that would amount to unfair trade practices under c. 93A § 2(a). Whitney v.Continental Ins. Co., 595 F. Sup. 939 (D. Mass. 1984), relied upon by Priority, involved a consumer as plaintiff so that a violation of c. 176D automatically became a violation of C. 93A § 2(a). Spencer Press, Inc. v. Utica Mutual Ins. Co.,679 N.E.2d 236 (Mass.App.Ct. 1997) specifically held that a failure by an insurance company to effectuate a fair settlement in violation of C. 176D § 3(a)(f) did not give rise to a c. 93A unfair trade practices claim when brought by a commercial plaintiff.
Consequently, this court concludes Priority has failed to prove its count that Hartford Steam violated the Massachusetts Unfair Trade Practices Act.
 IV. Damages
Priority has the burden of proof on damages and they must be established "with reasonable certainty." Expressway Associates IIv. Friendly Ice Cream Corp. of Conn., 218 Conn. 474, 476-77
(1991) Mathematical exactitude is not required, but "plaintiff must nevertheless provide sufficient evidence for the trier of fact to make a fair and reasonable estimate." Falco v. JamesPeter Associates, Ins., 165 Conn. 442, 445 (1973).
The evidence established that the fire in Priority warehouse was moderately severe. Firemen's hoses and the sprinkler system doused the first floor where greige goods were located and heavy smoke and soot filled the second floor where finished goods were located. Damage occurred to five classes of fabrics: (1) burned greige goods of Priority's customers; (2) smoke damaged greige goods of Priority's customers; (3) water damaged greige goods of Priority's customers; (4) smoke damaged finished goods of Priority's customers, (5) smoke damaged goods owned by Priority.
The burned greige goods were damaged beyond repair. Wet greige goods had to be washed, aired, dried. Smoke-damaged greige goods had to be scoured twice to remove the smell. Mr. Walter Gasior, a fabric expert, testified that normal scouring of greige goods once to remove the seizing would also eliminate smoke smells. However, Rodrigues and Paiva testified they smelled the goods after one scouring and it did not remove the odor, so they had to do it again. The court believed this testimony. Smoke-damaged CT Page 11298 finished goods had to be aired, old tubes and cartons discarded, fabric repacked on new tubes and in new cartons. Some had to be washed to remove stains. Thus the court concludes that extra work was required to restore all the damaged goods, except burned greige goods.
The issues as to damage are (1) the number of yards reworked as a result of the fire, and (2) the cost per yard of reworking.
Burned greige goods were placed in a trailer after the fire. A handwritten inventory of these goods, taken and signed by Mendes, working for Grosky, and Tesler, working for Popaolo, shows 29,085 yards.
As for the yards of wet greige goods reprocessed, the court finds most reliable summary sheets prepared by Paiva on a daily basis as the work was being done. The total on these sheets was 43,895 yards.
Similarly, as for the yards of smoke damaged greige goods reprocessed, the court finds most reliable summary sheets prepared by Paiva on a daily basis as the work was being done. The total on this sheet comes to 554,533 yards.
As for the yards of smoke-damaged finished goods rehandled, Oliveria prepared summary sheets on a daily basis from travel tickets. The total of those sheets came to 950,137 yards. Brennan prepared summaries of reworked finished goods based on old and new packing memos. The total from those sheets came to 1,158,038 yards, corrected to 1,091,352 yards to account for yards of repacked goods not matched to the original inventory. The court finds Oliviera's figures to be more reliable and adopts his total of 950,137 yards of finished goods rehandled.
Schneider examined Priority's books and determined a cost of $1.50 a yard for replacing burned greige goods.
To determine the unit cost of restoring damaged greige and finished goods, Schneider did not attempt to calculate the cost of each step of reprocessing. Rather, he analyzed the company's financial records to determine the average cost per yard of the Priority departments doing the work. He relied upon the company's allocation of costs among departments but made an independent judgment that the allocation was reasonable. He then checked his unit costs against those arrived at by Peat Marwick, which had CT Page 11299 made a similar analysis in preparing an audit to substantiate a Priority claim for water damages in 1992, and found his costs compatible. However, Peat Marwick had relied on over-all costs by departments and Schneider broke down costs into labor, material and overhead for each department. Schneider also compared payroll records and operating costs in 1992 and 1993 and concluded unit costs for 1993 should be increased by 13.5% over 1992. Although rehandling was done in 1994 and 1995, Schneider did not factor in increases for those years.
In making his analysis, Schneider followed generally accepted accounting principles and reached his determination of unit costs with a reasonable degree of accounting certainty.
Hartford Steam asserts Schneider's testimony should not be relied upon because it was based on hearsay evidence and he did not use any special skill or knowledge beyond the understanding of the trier. The court finds no merit to this assertion. Schneider was a fully qualified certified public accountant. He based his opinion upon an examination and analysis of Priority's books and financial records and made an independent judgment of their reliability. Massachusetts recognizes that an expert can testify to the value of a business on the basis of an examination of business records. Delano Growers' Cooperative Winery v.Supreme Wine Co., 473 N.E.2d 1066, 1076 (Mass. 1985). And accountants generally have been allowed to give opinions on the financial matters of a company by relying on company financial statements. Jackson v. Russell, 498 N.E.2d 22, 27 (Ind.App. 1 Dist. 1986); Carver v. Quality Inspection Testing, Inc.,946 P.2d 450, 453-54 (Alaska 1997).
Schneider determined the cost of restoring water and smoke-damaged greige goods to be $0.1785 per yard.
On the proof of loss, Schneider fixed the direct labor and overhead cost of rehandling finished goods at $0.2258 per yard. When he added the material cost of tubes and cartons, the total cost for rehandling 1,493,595 yards came to $450,475. The court concludes from these numbers that the cost for direct labor, overhead, and materials for rehandling finished goods was $0.3015 per yard (450,375 divided by 1,493,595).
Thus based on these figures of numbers of yards and cost per yard, the court calculates damages as follows: CT Page 11300
 Burned greige goods: 29,085 yards at cost of replacement of $1.50 per yard $ 43,627
 Wet greige goods: 43,895 yards at cost of restoration $0.1785 per yard $ 7,835
 Smoke damaged greige goods: 554,533 yards at cost of restoration $0.1785 per yard $ 98,984
 Smoke damaged finished goods: 950,137 yards at cost of rehandling $0.3015 $ 286,466
Total $ 436,912
The court finds Priority failed to meet its burden of proof as to yardage and cost of restoration of its own fabric damaged in the fire and awards no damage for those goods.
Massachusetts General Law c. 231 § 6C allows interest on a contractual obligation at the rate of twelve per cent. The court concludes Priority is entitled to interest at that rate from the date this action was started on December 31, 1994 to October 1, 1998. On damages of $436,912, interest comes to $191,751, for a total award of $628,663.
Accordingly judgment may enter for plaintiff Priority against defendant Hartford Steam in the amount of $628,633, plus costs.
Robert Satter Judge Trial Referee